The **ISALY DAIRY COMPANY OF PITTSBURGH**, a corporation,
Plaintiff,

v.

**UNITED DAIRY FARMERS**, an association, and Ernest Hayes, Stanley Yagla and Luther Elkin, individually and as officers of such association, Defendants.

**Civ. A. No. 65–1140.**

United States District Court
W. D. Pennsylvania.

Jan. 28, 1966.

Clyde W. Armstrong, Thorp, Reed & Armstrong, Pittsburgh, Pa., for plaintiff.

Tempest & Simmons, Monongahela, Pa., John W. McIlvaine, Washington, Pa., for defendants.

DUMBAULD, District Judge.

Before us is an application for a preliminary injunction. Testimony has been taken during several days, and transcribed. Subsequently elaborate requests for findings and briefs have been submitted by the parties.

In the guise of antitrust actions the parties are endeavoring to conduct collective bargaining regarding the price of milk in the Pittsburgh area. This method of negotiation evinces all the inade-

quacies pungently described by the late Justice Robert H. Jackson as inherent in "government by lawsuit". Jackson, The Struggle for Judicial Supremacy, 287–88 (1941).

The "embattled farmers" of the Western Pennsylvania region on October 4, 1965, filed suit at No. 65–1072 under the Sherman Act (15 U.S.C. § 1 et seq.) against Isaly Dairy Company (hereinafter called Isaly) and three other dairy companies alleging a conspiracy to restrain trade in fluid milk, apparently by price-fixing arrangements effected through Dairyman's Co-operative Sales Association, Inc. (hereinafter called DCSA), at prices lower than producing members of said association feel to be in their best interests. Named as co-defendants are directors of said association, but the association itself is not named as a defendant. Apparently the gist of the grievance is that the association is operated as an instrumentality subservient to the interests of the dairies rather than as a faithful bargaining agent fighting for the welfare of its constituent farmer members.

On October 25, 1965, Isaly Dairy Company filed the instant action (No. 65–1140) against United Dairy Farmers (hereinafter called UDF) and certain individual dairy farmers who were active in forming United Dairy Farmers, at first as a loose association claiming a membership of 2,000 farmers, but subsequently incorporated, and having apparently only fifteen stockholder members at the date of hearing (Tr. 90). This complaint alleges conspiracy to monopolize the Pittsburgh milk market, and to fix the prices of milk there sold.

Although cast in the form of an antitrust case, it would appear that what Isaly is actually complaining of could more properly be described as the tort sometimes called "inducing breach of contract". Sayre, Inducing Breach of Contract, 36 Harv.L.Rev. 663 (1923); Restatement, Torts, § 766. The classical example is Lumley v. Gye, 2 Ell. & Bl. 216 (1853), where a singer was enticed

to break a contract with plaintiff and sing at a rival theatre.

In the case at bar, Isaly has always obtained its entire milk supply under a contract with DCSA.

Defendants in the case at bar are farmers who supply milk to Isaly. Hence under Isaly's scheme of purchasing all requirements from DCSA, defendants are required to become members of DCSA in order to continue to supply Isaly.

The "embattled farmers" feel that DCSA is not acting loyally in the interests of its farmer members but is a tool of the dairies who purchase from it; that the DCSA price is diluted by its out-of-state purchases of low-cost milk; and that in any event it would be more advantageous for the members to sell directly to the dairies they supply, without losing the commission or selling costs now deducted by DCSA from the return to the farmer members of DCSA. However, even if DCSA were replaced by UDF as a selling agency for the milk produced by the farmers involved, there would probably be just as high administrative costs as now; the chief gain to the farmers would be obtained only if the new agency were a more vigorous bargainer and won for its constituents a higher price for milk.

■ The tort of "inducing breach of contract" would be governed by State law, and is not before us, there being no diversity of citizenship.

■ Insofar as the antitrust laws are concerned, it would seem that the method of selling and buying milk, and the price thereof, are matters entirely within the discretion of the parties, and the proper subject of bargaining between them.

■■ It would seem that Isaly is entirely free to buy all its requirements from DCSA if it so chooses; likewise that defendant farmers are entirely free to sell their production through UDF rather than DCSA if they so choose. United States v. Colgate & Co., 250 U.S. 300, 307, 39 S.Ct. 465, 63 L.Ed. 992 (1919); Sunkist Growers, Inc. v. Winck-

ler & Smith Citrus Products Co., 370 U.S. 19, 29, 82 S.Ct. 1130, 8 L.Ed.2d 305 (1962); Tampa Electric Co. v. Nashville Coal Co., 365 U.S. 320, 327, 81 S.Ct. 623, 5 L.Ed.2d 580 (1961); Perkins v. Lukens Steel Co., 310 U.S. 113, 127, 60 S.Ct. 869, 84 L.Ed. 1108 (1940); Patterson v. United States, 222 F. 599, 621–622 (C.C. A.6, 1915).

■ Insofar as the fluctuations of a free market are to be considered incompatible with the public need for an adequate supply of healthful milk, or with the preservation of farming as a cherished way of life rather than as a mere means of earning a livelihood, the remedy is to be found in other legislative enactments than the Antitrust Laws.

Following the dramatic overthrow of the first farm relief program in United States v. Butler, 297 U.S. 1, 68, 56 S.Ct. 312, 80 L.Ed. 477 (1936), the "New Deal" philosophy prevailed in subsequent decisions. Nebbia v. People of State of N. Y., 291 U.S. 502, 538, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Milk Control Board of Pennsylvania v. Eisenberg Farm Products, 306 U.S. 346, 350, 59 S.Ct. 528, 83 L.Ed. 752 (1939); United States v. Rock Royal Co-operative, Inc., 307 U.S. 533, 560, 569–571, 59 S.Ct. 993, 83 L.Ed. 1446 (1939); H. P. Hood & Sons v. Du Mond, 336 U.S. 525, 530–531, 69 S.Ct. 657, 93 L.Ed. 865 (1949); Dean Milk Co. v. City of Madison, 340 U.S. 349, 354, 71 S.Ct. 295, 95 L.Ed. 329 (1951).

Federal regulation relating to milk marketing is thus now available, but defendant farmers chose not to invoke it, but rather to oppose it. 7 U.S.C. § 608c; Tr. 169.

Pennsylvania has also established milk price legislation. 31 P.S. 700j–101 et seq. The fact that the Milk Control Board has recently been in bad odor, and may be considered as an illustration of the rule that the passage of time often dims the crusading zeal of regulatory bodies and makes them attentive rather to the interests of the interests regulated than

to the interests of the public,[1] does not detract from the truth of the proposition that the milk problem is one for solution by legislative and administrative action, if such be needed in addition to bona fide economic bargaining by the parties, rather than by litigation in the courts.

Insofar as actual interference with interstate commerce is concerned, plaintiff proved that one truck was two and a half hours late in reaching its interstate destination. (Tr. 203, 226–27).

■ While it is true that the Antitrust Laws are designed to strike down monopolies "in their incipiency", there is no showing of even an incipient monopolization by defendants here. Standard Fashion Co. v. Magrane-Houston Co., 258 U.S. 346, 356, 42 S.Ct. 360, 66 L.Ed. 653 (1922); Times-Picayune Pub. Co. v. United States, 345 U.S. 594, 622–623, 73 S.Ct. 872, 97 L.Ed. 1277 (1953).

Indeed the bulk of plaintiff's case was devoted not to proof of monopolization of the Pittsburgh milk business by defendants, or their usurping the Isaly business now handled by DCSA, but to description of the picketing of Isaly plants.

The major demonstration took place on September 30, 1965, at the Isaly plant in the Oakland district. It was soon quelled by a special squad of police, and later Judge Loran Lewis of the Allegheny County Court of Common Pleas regulated the picketing by an order, the exact terms of which neither side seemed to think important enough to put into the record here.

Such judicially supervised picketing still continues at some of plaintiff's stores, but apparently no longer is there any physical obstruction preventing the movement of traffic in and out of plaintiff's plant or other business locations. Such obstruction occurred only on September 30, 1965, until it was suppressed by the police.

---

1. See Huntington, "The Marasmus of the ICC: the Commission, the Railroads, and the Public Interest", 61 Yale L.J. 467 (1952).

The picketing therefore presents no issue in this Court. Of course, it is unpleasant and may have some adverse effect upon plaintiff's business. But it is *damnum absque injuria*. In the absence of a "context of violence" it may be regarded as a mere exercise of freedom of speech, "telling the farmers' story", as the defendant Hayes so repeatedly remarked on the witness stand.[2] Milk Wagon Drivers Union, etc. v. Meadowmoor Dairies, 312 U.S. 287, 293, 61 S.Ct. 552, 85 L.Ed. 836 (1941). Insofar as violence is involved, it is a matter for State handling, and is apparently being handled satisfactorily. At least there is no showing of substantial or irreparable injury connected with continuing or threatened violence.

Modern mores seem to accept mass demonstrations, often attended with some annoyance or inconvenience to property owners and the general public, as part of our constitutional way of life. Members of the clergy seem to feel a conscientious compulsion to violate laws of which they disapprove, and to die underneath bulldozers or at an assassin's hand, if necessary, to bear witness to their beliefs.

The "embattled farmers" who are defendants here are therefore simply making a successful "adjustment" to the surroundings of their modern cultural milieu when they dramatize their claims by demonstrations. Their standing is not inferior to that of other protesting groups, merely because they did not hire Mike Quill or Martin Luther King to serve as impresario of their show.

If "sit-ins" on other people's property by persons who wish to buy milk from persons who do not wish to sell it to them are permissible [Barr v. City of Columbia, 378 U.S. 146, 84 S.Ct. 1734, 12 L.Ed.2d 766 (1964); Bell v. State of Maryland, 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822 (1964); Bouie v. City of Columbia, 378 U.S. 347, 84 S.Ct. 1697, 12 L.Ed.2d 894 (1964), *exempli gratia*], why is it not equally proper for those who wish to sell milk to persons who do not wish to buy it from them to infest the premises of the unwilling purchaser?

Are the defendants' practices any more offensive than those of the touts for hotels who swarm around railroad stations in Europe, or for that matter of television hucksters, or other aggressive salesmen of unwanted services and products? Is the reiteration of the farmers' view of the milk situation any more offensive than the noisy advertising to which riders of public transportation were involuntarily subjected, without relief from the courts, in P. U. C. v. Pollak, 343 U.S. 451, 463, 72 S.Ct. 813, 96 L.Ed. 1068 (1952)?

Accordingly, there is no ground upon which the preliminary injunction sought by plaintiff may be granted.

This opinion shall be deemed to include the Court's findings of fact and conclusions of law.

---

2. Tr. 55, 60, 93, 94, 96, 101, 104, 124, 126, 135–36, 147, 148, 151, 159, 180, 181.