388 F.2d 789
 OTTO MILK COMPANY, Plaintiff-Appellee,
v.
UNITED DAIRY FARMERS COOPERATIVE ASSOCIATION, United Dairy Farmers, Ernest Hayes, J. D. Smouse, Joseph M. Piper, Stanley Yagla and Adam Babiarz, United Dairy Farmers Cooperative Association, Ernest Hayes, J. D. Smouse, Joseph M. Piper, Stanley Yagla and Adam Babiarz, Appellants.
 No. 16386.
 United States Court of Appeals Third Circuit.
 Argued September 25, 1967.
 Decided December 26, 1967.
 
 Paul A. Simmons, Tempest & Simmons, Monongahela, Pa. (John W. McIlvaine, Washington, Pa., on the brief), for appellants.
 Walter T. McGough, Reed, Smith, Shaw & McClay, Pittsburgh, Pa. (Steven A. Stepanian II, Harry H. Weil, Pittsburgh, Pa., on the brief), for appellee.
 Before McLAUGHLIN, HASTIE and FORMAN, Circuit Judges.
 OPINION OF THE COURT
 McLAUGHLIN, Circuit Judge.
 
 
 1
 Appellee sued defendants under sections 1 and 2 of the Sherman Act (15 U. S.C. Sections 1 and 2) for engaging in an unlawful conspiracy in restraint of trade and for endeavoring to monopolize the marketing of milk in the particular southwestern area of Pennsylvania involved. The third count of the complaint, urged under the pendent jurisdiction of the district court, was for unlawfully interfering with plaintiff's relations with its customers. The case was heard on the merits of all three of plaintiff's charges on June 14 and 22, 1966. The three counts were sustained by the trial judge. A decree was issued which permanently enjoined the defendants.
 
 
 2
 "* * * from inducing, or attempting to induce, directly or indirectly, any present or potential customer of plaintiff to refuse to purchase products from plaintiff and, in connection therewith, from picketing or demonstrating, or threatening to picket or demonstrate, before or about any retail store in and around Western Pennsylvania, or in any other place which is, or may become, a purchaser of the bottled milk or dairy products of plaintiff."
 
 
 3
 Appellee buys raw milk, then processes, bottles and sells it to retail stores. The milk comes from Western Pennsylvania farms, is handled at appellee's receiving plants in Pennsylvania and Ohio and sold as bottled milk and other dairy products in Pennsylvania, Ohio and West Virginia. Plaintiff's milk supplier during the critical period was Dairymen's Co-Operative Sales Association (DCSA). Plaintiff's president, Thomas P. Otto, as a witness, testified that there are in the neighborhood of 4,000 members of the DCSA with approximately 700 of these having furnished milk to plaintiff. Defendant-appellant United Dairy Farmers Cooperative Association (Association) is an incorporated association under the laws of Pennsylvania. Defendant United Dairy Farmers (UDF) admittedly was an unincorporated association. Defendant-appellant Hayes was sued individually and is designated in the complaint as currently president of the Association and of UDF. He admits being president of the Association. Defendants-appellants Smouse, Piper, Yagla and Babiarz were all sued as individuals and were stated to be currently respectively Vice President, Treasurer, Secretary and Assistant Secretary of the Association and UDF. An answer was filed on behalf of all defendants. The individual defendants admitted they were officers of the Association. They denied they were then officers of UDF. The trial court found as a fact that the individual defendants are officers of said organization.
 
 
 4
 Plaintiff Otto Milk Company sought a permanent injunction against the defendants from inducing or attempting to induce customers of plaintiff to refuse to purchase products from plaintiff and in connection therewith, from picketing or demonstrating before any retail store which was a purchaser of plaintiff's products. Defendants agreed voluntarily to stop the complained of conduct pending the outcome of this case.
 
 
 5
 So that the entire situation appears in its true perspective it is necessary to set out at some length highlights of the hearing testimony. As stated the president of plaintiff company was a witness. He said that on April 29, 1966 at the last contact he had with defendant Hayes the latter "asked that we discontinue the purchase of our milk supplies from the Dairymen's Cooperative Sales Association and buy the Class I needs from the United Dairy Farmers. He also at that time indicated that he couldn't be responsible for what might happen if we did not do so." Otto said that by May 26, 1966 "in various areas, pickets appeared before the stores of our very good customers." With reference to an article in the Pittsburgh Post Gazette titled "Dairymen to picket Otto outlets" in which defendant Hayes was purportedly quoted (Pltf's Ex. 2) the latter was called to the witness stand by the plaintiff. He was asked how many members the UDFCA had. He said that the last tally made probably two months previously, showed in the neighborhood of 600 members. He stated they were taking in new members all the time. After some back and forth he was asked "All right now, I will get back to you later, sir, but are we agreed that you did tell the reporter from the Pittsburgh Post Gazette that you were going to tell your story and `this', meaning walking around with cards or signs was the only way to do it? A. I didn't say the only way, I said this was a way that we would inform the public." Hayes, shown a sign by his lawyer, identified it as "a sign that our members was carrying, * * *." He agreed with his attorney that it was the typical sign that was carried by the persons who were telling their story. A little later plaintiff's attorney referring to the same sign asked Hayes "Incidentally on the back, it says `UDF and DSCA'. What's that?" Hayes answered saying "This is an old sign." and went on to explain that they "just turned it over and used the side that there was nothing printed on it."
 
 
 6
 Otto, returning to the stand, stated that his company since that May had been obtaining all their dairy products from Western Pennsylvania farms. A letter from the Pennsylvania Milk Control Commission to plaintiff company advised "that the audit recently completed by our auditors reveals that your company purchased its entire milk supply for the month of May, 1966 from 740 Pennsylvania producers." The witness testified that because of the pickets the numbers of stores that discontinued the Otto product totaled a weekly purchase from Otto of some $3,670. In addition leaflets or pamphlets which the defense attorney said were printed by UDFCA were distributed by persons wearing the alluded to signs and walking up and down in front of stores belonging to Otto customers. Hayes, as a witness, said United Dairy Farmers paid for the printing and that "it was written back when we negotiated the contract with Beverly Farms." (Emphasis supplied). The leaflet or pamphlet was marked in evidence as plaintiff's exhibit 5. It was read into the record as follows:
 
 
 7
 "A. The heading in bold type, `Help your local farmer help you. When you buy milk today, please buy Beverly Farms United Dairy Farmers milk. When you do this you are actually helping your local farmers stay in business and you are getting better milk. The only carton of milk guaranteed to have local farmers' milk in it, is the one which has the black "United Dairy Farmers" handle. We local farmers need your help and support. When you buy Beverly Farms United Dairy Farmers milk you help us help you keep the price down. If your dealer does not have the milk with the United Dairy Farmers label from Beverly Farms — ask him for it. Thanks and God bless you for helping us stay in business to better serve you and your children. United Dairy Farmers Cooperative Association.'" (Emphasis supplied).
 
 
 8
 Otto denied that Beverly milk was better than his. He was asked one other way customers could be sure of obtaining local milk and answered. "They can buy it from Otto Milk and they can buy from other dairies." Otto went on to say that their customers had been reporting to them that they had been asked and in some cases demanding that they take Otto milk off sale. "In addition to this," he said, "the good will of the Otto Milk Company is definitely in jeopardy when our customers feel that when they handle our product, which is all from Pennsylvania and all from Western Pennsylvania and all paid for at the Pennsylvania Milk Control prices, they are incurring the wrath of a group of producers, farmers." Plaintiff's ex. 6 in evidence was a statement over Radio Station KQV, June 10, 1966 by Mr. MacIlvane one of the two attorneys who tried this suit on behalf of defendants. It was read into the record by the witness. It appears in Footnote.[1] It flatly accused the Pennsylvania Milk Control Commission of "approving the conniving and carrying-ons between Otto and the DCSA to water down the price the farmer actually receives for his milk."
 
 
 9
 Mr. DiGuglielmo, a storekeeper, testified he had handled Otto products over two years, since he had owned the store. On June 1st a man and a woman came to his store, told him they were from United Farmers Dairy Association and that if he wouldn't quit handling the Otto product, they would put a picket line at his doors. They told him they would allow him to get rid of his stock and would be back to check. He answered "O.K. I would not,". He then talked to the Otto company and, as he testified, "I told them what happened so I told them I didn't want their drivers to stop until this thing was settled." He has not had any Otto products since that time.
 
 
 10
 Otto, recalled, testified that twenty-three stores had turned out their Otto milk in the last three weeks and he named them all.
 
 
 11
 Mr. Marcinek, another storekeeper, told of being visited on May 31, 1966 by four ladies who said they represented United Dairies and United Dairy Farmers. They told him if he didn't take Otto milk out of the case, they would demonstrate in front of his store. They admitted Otto milk was paying the full price but said they were not getting it. Marcinek refused and stated that they picketed in front of the store with a card that had the name "United Dairy Farmers" printed on top of it. The pickets were later increased from the four ladies to around twenty-two people. This was a store in an industrial section, a strong union labor center. Marcinek said he lost business because of the picketing. In addition, an attempt was made by one of the pickets to persuade a person delivering non related merchandise to the store, not to make the delivery, as unfair to union labor.
 
 
 12
 Hayes, recalled, under cross-examination for the plaintiff, admitted that possibly all Otto's milk in the immediately preceding month of May came from Pennsylvania. Later he said that he never told the newspaper reporter above referred to "that Otto was buying milk out of the state." He also said "At the present time, I would say that this is correct, that they are buying all their milk in Pennsylvania." He agreed that the Otto Milk Company pays the applicable Pennsylvania prices.
 
 
 13
 Louis E. Milks, Jr., a driver salesman for Otto, on May 25, 1966 in calling on a Sligo Market customer found eight to ten pickets walking in a tight little circle in front of the store. They carried signs saying Otto was unfair to the farmers. The signs at least had the letters "UDF". Shortly after that the market owner left a note for the witness' relief driver that due to circumstances beyond his control he was going to discontinue Otto milk at the present time. That market had been a customer of Otto for at least three years. After leaving the above noted market, Milks visited another Sligo store right up the street from the first one. Coming out of the second store he saw that his gas cap was missing from his car. The pickets from the first store had followed him to the second place. Going on to the town of Clarion to the A & P store there, he found men pickets in front of the premises with the same sort of signs having UDF on them. He left less than half his normal delivery at that store. The pickets told him that when they got Otto signed up they would go after another dairy. On his next trip to that store he found that all Otto milk had been removed from the service store and that there was nothing in the dairy case. At the supermarket in Clarion, the witness "had to take all the milk out * * *." His ordinary sales to that store ran $400 to $450 a week. He made no sales at all there that day. His sales during the picketing declined around a thousand dollars a week.
 
 
 14
 Hayes again on the stand for cross-examination was questioned as to the United Dairy Farmers. He was asked "Well, did it exist in April (Mr. Simmons, attorney for defense) Which year, sir? (Plaintiff's attorney) Of 1966 I think this is. A. (Hayes) I couldn't be correct about this, but I think it had." (Emphasis supplied). Asked "And you were president of United Dairy Farmers also, weren't you? A. I was." Confronted with his testimony of March 18, 1966 before the Milk Control Commission he admitted that he had stated to the Commission "We have 2,000 people that have signed membership cards to be members of United Dairy Farmers. I would say they are United Dairy Farmers, yes, sir." Answering here he stated "Well, these are cards that were signed as United Dairy Farmers, yes. Q. Not the co-op? A. We didn't have the co-op yet." Asked "All right, in March you had 2,000. To-day how many members do you have? A. I said the last count I had was something over 600." Asked, "I am trying to find out where are those 2,000 people today, in what organization? A. Well, I would say there's some of them that's in United Dairy Farmers. Some of them that has not yet joined United Dairy Farmers co-op." (Emphasis supplied).
 
 
 15
 With regard to the use of the word "pickets" and Hayes' knowledge of the persons who walked in front of the various stores he was asked and answered as follows:
 
 
 16
 "Q. Who is your picket captain?
 
 
 17
 A. There's picket captains in different areas.
 
 
 18
 Q. Tell me who they are.
 
 
 19
 A. I don't know them.
 
 
 20
 Q. Tell me the areas.
 
 
 21
 A. The county officers of each county can probably know the picket captains. As far as myself, I don't pick them.
 
 
 22
 Q. Who picks the picket captains?
 
 
 23
 A. Membership theirself.
 
 
 24
 Q. Who picks them?
 
 
 25
 A. Membership.
 
 
 26
 Q. Well, do you know any picket captains?
 
 
 27
 A. Offhand no. I don't keep tab on any of them.
 
 
 28
 Q. You don't know the names of a single picket captain?
 
 
 29
 A. No, I have enough to do without worrying about them.
 
 
 30
 Q. Do you know the name of any person who has picketed?
 
 
 31
 A. I would know quite a few, yes."
 
 
 32
 Rudolph Svrcek, an Otto driver salesman, was the next witness. He has had eighteen years experience as such salesman. He serves several Western Pennsylvania towns. On May 31, 1966 he saw pickets outside an Otto delivery store in Browneville. The next day the store authority made him buy back his Otto milk with the store refusing any more deliveries of it. He was shown the sign in evidence about Otto milk with the UDF initials on the back thereof. He said it was similar in all respects to signs the pickets had except that the language on the latter about not boycotting or picketing Otto was in smaller letters. At another store the next day a woman whom he had seen picketing came in and told the owner "You could sell any milk except Otto." Svrcek had to take his milk out of the store. He specifically stated that he saw that woman the same afternoon carrying a sign similar to the one introduced into evidence by the defendants. In the first talk he had with the woman she "made the statement that they would upset the Otto trucks." She favored this "to hurry up the situation." The witness added that the woman told the above mentioned storekeeper, "We don't want you to handle Otto milk." He said that because of the pickets he was unable to serve four of his stops and named them. This meant his route was down close to a $1,000 a week.
 
 
 33
 John Martin, secretary and controller of the plaintiff, was a witness. He said that for the last several years plaintiff had averaged $644,000 paid for plastic milk containers to out of state manufacturers; that plaintiff is starting to make them itself in Pittsburgh; that its projected out of state purchase of plastic for these during the next year is a quarter of a million dollars. Containers for its other milk products are supplied from named sources in New Jersey, Ohio and Michigan. Otto's average purchases of these amounted to $135,000. The milk cases come from Massachusetts. These average per year, $18,000. Other products, fruit flavoring and sugar, are obtained from stated companies in Michigan, Illinois, New York and Ohio. These total to $258,000 worth a year. Replacements for vehicle parts, etc., are obtained from Detroit, Michigan. The witness said that during the picketing, thirty of the Otto customer stores completely discontinued Otto products; that the weekly company loss of sales from this was $3,677; that the total reduction in route sales per week amounted to $6,700. Since the activities complained of stopped, the sales came back up. He affirmatively stated that if the conduct continued and sales declined they would have to reduce their purchases from out of state.
 
 
 34
 Jackson Dixon was the concluding witness for the plaintiff. He is supervisor for the Great Atlantic & Pacific Tea Company of fourteen A & P stores in Western Pennsylvania. He had personal knowledge of the picketing of his stores in the latter part of May or early June, 1966. He said 85 per cent of his store items come from outside Pennsylvania. The annual A & P purchases for his stores run into millions of dollars. The picketing of those stores did have some effect on their sales. The A & P continued to sell Otto milk and that action had a decreasing effect on their overall sales.
 
 
 35
 Hayes and Harry W. Wolfgang comprised the defense witnesses. The former said that they used the name United Dairy Farmers "until we got the co-op." He attempted no explanation of his earlier statement that some of his group were still using the name United Dairy Farmers. Hayes indicated very strongly that he did not want Otto to buy milk through the Dairymen's Co-Operative Sales Association but to buy direct from these farmers. He was asked on cross-examination "why don't you have your people go around in front of the stores that handle the milk that comes from Ohio, with these signs on it instead of Mr. Otto's customers." He answered "Well, we can only go to certain stores right now. We only have so many people." He was asked on cross-examination "Wouldn't it be helpful, most helpful, if everybody only purchased Pennsylvania milk at Pennsylvania prices, all dairies? A. I would say this would be helpful also. Q. It would be very helpful wouldn't it? And Mr. Otto now does that? A. That's correct. Q. That's all."
 
 
 36
 Mr. Wolfgang said he was a milk producer, a member of both DCSA and UDFCA. He was asked on cross-examination "Now you are a shipper to Otto, which has a high class I utilization. If Otto dealt directly with you, what would happen to the member farmer producer of the DCSA who ships to somebody, dairy that has only a 35 per cent Class I utilization as opposed to Otto's about 60 per cent? A. I don't think that would happen in Western Pennsylvania. The Ohio milk blends us down. Q. So the answer is buy Pennsylvania milk? A. Yes, definitely." (Emphasis supplied).
 
 
 37
 Plaintiff had four affidavits of other storekeepers marked in evidence. These had been for use on its motion for preliminary injunction. After that proceeding was telescoped into a final hearing on the merits under the stipulation of the parties, plaintiff introduced the said affidavits on the theory that they were properly a part of the full proceedings before the court. The court accepted them over the objection of defendants. Plaintiff argues forcibly that but for the stipulation converting the initial proceeding for preliminary injunction into final hearing, it would have produced the affiants in court as witnesses at the final hearing. The affidavits are cumulative of the testimony presented on behalf of the plaintiff. We see no need of adding the question of their validity to the issues before us in this appeal. We therefore have not considered them and express no opinion on that problem at this time.
 
 
 38
 No pretension is made that the above testimony has been tightly catalogued. However, it does present a cohesive, clear picture of the purposes and actions of the defendants which brought about the situation in which plaintiff found itself in June of 1966. None of plaintiff's evidence was validly contradicted, indeed little if any attempt was so made on the part of the defense. In large part on appellants' side the hearing was devoted to the shotgun argument efforts for the defense to the effect that assuming what was said and offered in evidence by the plaintiff was true, the latter had no right to be in court on any of its grievances.
 
 
 39
 The defendants-appellants put forward as a primary contention that there was not sufficient evidence of them having violated the Sherman Act by engaging in an unlawful conspiracy in restraint of trade. They seem to be quite content to base their position that there was no conspiracy at all, on the testimony of the defendant Hayes. They say Hayes denied there was such an unincorporated association as United Dairy Farmers and that he said it ceased to exist legally on November 5, 1965. They fail to mention that United Dairy Farmers, sued as a defendant, has been and still is represented in this litigation by counsel; that there was never any motion to strike UDF as a defendant; that according to Hayes, the 2,000 farmers, signed up in March 1966, were so signed as members of the UDF and not the co-op. Hayes himself under oath then said as to March 1966 "We didn't have the co-op yet." The above quoted record shows he thought the UDF was in existence in April 1966. He concluded that sequence of his testimony by answering in response to counsel's query as to where the 2,000 UDF people are today, "Well I would say there's some of them that's in United Dairy Farmers. Some of them that has not yet joined United Dairy Farmers co-op." This evidence from the president of UDF and actually most of the other testimony bearing on UDF in the record make it plain that UDF down to and including trial time was an existing organization sharing in the concerted activity against Otto. And it is plain that the pickets or marchers carrying UDF signs do indicate the participation in that movement by that group. Cf. William Goldman Theatres, Inc. v. Loew's, Inc., 150 F.2d 738, 743-744 (3 Cir. 1945), cert. den. 334 U.S. 811, 68 S.Ct. 1016, 92 L.Ed. 1742 (1945). The evidence of record concerning UDF being a live group during the critical period which, with the Association, Hayes and the other individuals who were officers of both, marched in front of the various Otto West Pennsylvania customer stores carrying signs bearing the insignia of the two organizations and statements that "Otto Milk Company refuses to pay fair prices for milk", "* * * refuses to pay fair prices to farmers", "* * * unfair to the farmer", was believed by the trial judge who so found as a fact. Among other items fully justified by the evidence included in the Findings of Fact were that the pickets of the defendants UDF and the Association advised the store people they would leave if the latter stopped selling Otto milk and that they tried to have the stores substitute Beverly Farms' products for Otto's. It will be remembered that Beverly Farms, a competitor of Otto, was the company that had a contract with UDF which Hayes definitely implied at least also related to the Association. It will be remembered too that the pickets distributed the leaf-lets put out by UDF urging the purchase of Beverly milk.
 
 
 40
 Appellant Association contends vigorously that it is an agricultural co-operative association within the Capper-Volstead Act, Section 1, 7 U.S.C. Section 291. There is no dispute on this point. In that genuine status it of course is not in violation of Section 1 of the Sherman Act. However, based on sufficient evidence which the trial court accepted as credible, the Association was found to have conspired with UDF (which was not protected by the Capper-Volstead Act) and Hayes and the other officers of UDF in express violation of Section 1 of the Sherman Act. Under the evidence, the trial judge rightly refused to go along with the defendants' assertion that their conceded movement against Otto was simply that of one business entity. Defendants' fundamental theory, all of its argument, all of its cited decisional law is founded on the false premise that the UDF and its president Hayes in that capacity were not involved in palpably wrongful acts and conduct against plaintiff and therefore there was no conspiracy. Appellants finally suggest on this conspiracy proposition that if this Court finds that UDF exists and assuming all plaintiff's evidence to be true, the defendants are in law a single entity and there is no proof of conspiracy with another person or entity to substantially restrain trade. They propose in support of this, Isaly Dairy Co. of Pittsburgh v. United Dairy Farmers, 250 F.Supp. 99 (W.D. Pa.1966). As the trial judge here found, "the facts in the Isaly case are entirely different from the facts in this case." There in what was originally a state litigation, the defendants were the UDF and Hayes, Yagla and Elkin individually and as officers of UDF. In Isaly, it was the plaintiff's plant which was picketed as agreed to by the defense attorney before us who represented the defendants in Isaly. There was no picketing of innocent third parties in that suit or any of the intimidation and pressure we have in this litigation. The citation of the latter by appellants is of some passing interest only because it sharply shows the there confessedly independent entity of UDF, Hayes and its other officers. See also Case-Swayne Company, Inc. v. Sunkist Growers, Inc., 389 U.S. 384, 88 S.Ct. 528, 19 L.Ed.2d 621, opinion filed December 18, 1967.
 
 
 41
 The trial judge found as facts that the pickets were associated with and that what they did was authorized by the defendants, that as a result plaintiff suffered business losses of some $3600. a week, that those losses will continue if defendants are not prohibited from those practices. Appellee strongly stresses that the agreements forced upon the Otto storekeepers by the defendants were illegal under the Sherman Act, that by them the storekeepers became coerced co-conspirators against appellee. Under the facts before us we think this argument sound. The whole integrated course of unlawful conduct directly brought about substantial loss of trade to Otto. The storekeepers by means of defendants' threats and pressures participated in the illegal scheme against Otto. Of itself this was a conspiracy under the Sherman Act. Flintkote Co. v. Lysfjord, 246 F.2d 368, 374-375 (9 Cir. 1957), cert. den. 355 U.S. 835, 78 S.Ct. 54, 2 L.Ed.2d 46 (1957). The picketing in this appeal was not, as defendant Hayes continually proclaimed at the hearing, to tell defendants' story. The testimony reveals that it was affirmatively an attempt to stop Otto sales in the Western Pennsylvania milk products market. It was a raw endeavor on the part of defendants to monopolize that market by forcing Otto out of its retail connections because it would not bow to the defendants' demands, leave its distributor Dairymen's Co-Operative Sales Association and function under the defendants' groups. That tactic illustrated defendants' ultimate goal. As announced callously by defendants and above quoted, after they harassed plaintiff into submission they intended moving along to the next processor, with the unmistakable objective, found by the trial judge, of destroying their major competitor, Dairymen's Co-Operative Sales Association and taking over the Western Pennsylvania milk products field. United States v. Addyston Pipe & Steel Co., 85 F. 271, 46 L.R.A. 122 (6 Cir. 1898), affd. 175 U.S. 211, 20 S.Ct. 96, 44 L.Ed. 136 (1899); Northern Pacific Ry. v. United States, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958). Even the boycott against Otto standing alone was wrong as could be. Klors, Inc. v. Broadway-Hale Stores, Inc., 359 U.S. 207, 79 S.Ct. 705, 3 L.Ed.2d 741 (1959); Evening News Publishing Co. v. Allied Newspaper Carriers, 263 F.2d 715 (3 Cir. 1959), cert. den. 360 U.S. 929, 79 S.Ct. 1449, 3 L.Ed.2d 1544 (1959); Paramount Pictures, Inc. v. United Motion Picture Theatre Owners, 93 F.2d 714 (3 Cir. 1937).
 
 
 42
 Appellants dispose of the serious question of their acts substantially affecting interstate commerce by saying "at no place has the Plaintiff shown that Defendants' acts affect interstate commerce in any substantial manner." The District Court found that "Defendants' activities if continued would have an effect on interstate commerce which would not be insubstantial." It further held that in the picketing retail grocery dealers and asking them to remove Otto's products from their stores, defendants have engaged in an operation amounting to a boycott of Otto and DCSA, designed to restrain and monopolize interstate commerce. There was sufficient proof to support this in the above quoted testimony of the Great Atlantic and Pacific Tea Company executive, Mr. Dixon and in the concise evidence of the Otto controller, Mr. Martin, above outlined.
 
 
 43
 We think that defendants interfered directly with the flow of interstate commerce which need not be in substantial degree. United States v. Columbia Steel Co., 334 U.S. 495, 68 S.Ct. 1107, 92 L.Ed. 1533 (1948); Apex Hosiery Co. v. Leader, 310 U.S. 469, 60 S.Ct. 982, 84 L. Ed. 1311 (1940), and indirectly by intrastate restraint affecting interstate commerce to a degree not "insignificant or insubstantial". International Salt Co. v. United States, 332 U.S. 392, 396, 68 S.Ct. 12, 92 L.Ed. 20 (1947). In this connection it should be additionally noted that the defendants drive against DCSA could not help but affect interstate commerce as that Association serviced Ohio milk farmers according to defense witnesses Hayes and Wolfgang. See also the very late United States Supreme Court decision, Burke et al. v. Ford et al., 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (December 11, 1967).
 
 
 44
 Taking up the important element of pendent jurisdiction, it is uncontroverted that if the federal questions in this litigation are not plainly wanting in substance, the District Court had jurisdiction of the cause of action set out in the third count of the complaint. That alleged that "The deliberate, malicious and wanton acts of the defendants were intended to and in fact did tortiously and without privilege, induce retail stores in the Western Pennsylvania area to discontinue their long standing relationships with Otto, the existence of which was well known to the defendants." Defendants would eliminate this cause by their blanket statement that there is no substance at all to the Sherman Act claims. Under Count 1, the conspiracy count, defendants simply protest that they were a single entity. Under Section 2 of the Act, the second count, defendants repeat they were all a legal entity and say there is no evidence that they monopolized the milk market in the southwestern Pennsylvania area. As to this latter defense, it might be well to point out that the Act does not require actual monopoly of the territory sought and that what happened with respect to this third count claim was a deliberate, organized, determined maneuver to obtain a milk products monopoly in the particular territory. That was directly in violation of Section 2 of the Sherman Act. Maryland and Virginia Milk Producers Assn v. United States, 362 U.S. 458, 80 S.Ct. 847, 4 L.Ed.2d 880 (1960); North Texas Producers Assn. v. Metzger Dairies, 348 F.2d 189 (5 Cir. 1965, rehearing denied 1965).
 
 
 45
 The trial judge found as a fact that "The purpose of defendants' activities was to induce the retail store operators to agree to stop handling Otto's products and, in many instances it was successful. The pickets not only wanted to tell their story, but they also wanted to stop customers from shopping at the stores and, in turn, stop the stores from dealing with Otto. The activities of defendants interfered with, and if not enjoined would continue to interfere with, the advantageous business relationship between Otto and its customers." He held that "The activities of defendants constitute a tortious interference with plaintiff's advantageous business relationship between Otto and its customers." He correctly concluded that conduct to be contrary to the pertinent Pennsylvania law. Glazer v. Chandler, 414 Pa. 304, 200 A.2d 416 (1964); Bruce Lincoln-Mercury, Inc. v. Universal C.I.T. Credit Corp., 325 F.2d 2, 13-14 (3 Cir. 1963). See also Hurn v. Oursler, 289 U.S. 238, 53 S.Ct. 586, 77 L.Ed. 1148 (1933); United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); Taussig v. Wellington Fund, Inc., 313 F.2d 472 (3 Cir. 1963). We must agree completely with the said factual findings and the conclusion of the District Judge.
 
 
 46
 Finally, appellants assert that their actions can be justified "as an exercise of freedom of speech." The district court found on substantial evidence that the defendants had violated the Sherman antitrust law by forcing the innocent store-keepers to boycott Otto's milk products and by intending as they did, after finishing with Otto, to continue in like fashion with the other processors and thus force its competitor distributor (DCSA) out of the Western Pennsylvania market. Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 69 S.Ct. 684, 93 L.Ed. 834 (1949) gives us a totally comparable guide on this. There dealing with a violation of Missouri law for just such threats to retailers as confront us in the defendants' offenses against the Federal Antitrust Law the Court said, pp. 497-498, 69 S.Ct. p. 688:
 
 
 47
 "It is contended that the injunction against picketing adjacent to Empire's place of business is an unconstitutional abridgment of free speech because the picketers were attempting peacefully to publicize truthful facts about a labor dispute. See Thornhill v. [State of] Alabama, 310 U.S. 88, 102 [60 S.Ct. 736, 744, 84 L.Ed. 1093,] and Allen Bradley Co. v. [Local] Union, 325 U.S. 797, 807, note 12, [65 S.Ct. 1533, 89 L. Ed. 1939]. But the record here does not permit this publicizing to be treated in isolation. For according to the pleadings, the evidence, the findings, and the argument of the appellants, the sole immediate object of the publicizing adjacent to the premises of Empire, as well as the other activities of the appellants and their allies, was to compel Empire to agree to stop selling ice to nonunion peddlers. Thus all of appellants' activities — their powerful transportation combination, their patrolling, their formation of a picket line warning union men not to cross at peril of their union membership, their publicizing — constituted a single and integrated course of conduct, which was in violation of Missouri's valid law. In this situation, the injunction did no more than enjoin an offense against Missouri law, a felony.
 
 
 48
 "It rarely has been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute. We reject the contention now. Nothing that was said or decided in any of the cases relied on by appellants calls for a different holding."
 
 
 49
 Appellants under the guise of peaceful picketing have been found to have been transgressing Sections 1 and 2 of the Federal Antitrust law. The Court below determined that constitutional protection does not reach Sherman Act offenders. The contrary is not here urged. We find no merit in the last point of appellants.
 
 
 50
 At the time the plaintiff's motion for preliminary injunction was heard, the plaintiff agreed to waive its claim for damages and counsel fees in consideration of the defendants agreeing that the hearing and the record thereof be considered as the final hearing and record on the permanent injunction sought.
 
 
 51
 The judgment of the District Court will be affirmed.
 
 
 
 Notes:
 
 
 [1]
 
 "THE STATEMENT OF JOHN MacILVANE FOR U.D.F.
 KQV — June 10, 1966
 The fact that the Pennsylvania Milk Control Commission approves of the audit (ah) of the Otto books means nothing. It only means that they are (ah) approving the conniving and carrying-ons between Otto and the DCSA to water down the (ah) price the farmers actually receives for his milk. Now the facts are that the farmer himself he gets his milk checked at at end of the month only receives eight (8) cents a quart on the average. Now, (ah) we can produce literally hundreds of farmers — and, aw I would say, farmers that are also shipping to Otto itself — where their checks will show that they only get eight (8) cents when they put, when they put it in their pockets. Now what happens to the, to the 12.47 cents that Otto says they pay to the DCSA we don't know." (Emphasis supplied).