**WASHINGTON TROTTING ASSOCIATION, INC., Plaintiff,**

**v.**

**PENNSYLVANIA HARNESS HORSEMEN'S ASSOCIATION et al., Defendants.**

**Civ. A. No. 77-51.**

United States District Court, W. D. Pennsylvania.

March 1, 1977.

Dale Hershey, Pittsburgh, Pa., for plaintiff.

Berle M. Schiller, Philadelphia, Pa., for defendants.

## OPINION

MARSH, District Judge.

The plaintiff, a Pennsylvania corporation which operates a harness horse racetrack, has brought this action alleging that the defendants, acting through the Pennsylvania Harness Horsemen's Association (PHHA), have violated the Sherman Act, 15 U.S.C. § 1, by attempting to restrain trade and to boycott the plaintiff's business. The PHHA is a non-profit corporation whose membership is made up of owners, trainers, drivers, and breeders of harness horses as well as other persons interested in harness horse racing. Plaintiff alleges that the defendants have sought to restrain the trade of plaintiff until the plaintiff accedes to the defendants' demands that the plaintiff recognize the PHHA as the sole bargaining entity for purposes of contracting with the plaintiff. Defendants have argued that the PHHA is a labor organization involved in a labor dispute, and thus, under the Norris-LaGuardia Act, 29 U.S.C. § 101, PHHA is exempt from the anti-trust laws.

The action is now before the court on plaintiff's motion for a preliminary injunction. After due consideration of the testimony of the witnesses and the arguments of counsel, this court concludes that the injunction should be granted.

## FINDINGS OF FACT

Plaintiff Washington Trotting Association (WTA) operates a harness horse racetrack in Washington County, Pennsylvania, known as The Meadows. WTA is licensed by the Commonwealth of Pennsylvania to conduct harness racing for 100 days in each calendar year. The Meadows' main source of income is the commission (approximately 11.5%) which it receives from the money wagered by the public at the track. From this pari-mutuel commission, The Meadows pays a purse to the owners of the horses that finish first through fifth in each race. In 1976, about 44.9% of the commission was paid out as purses to the owners of horses. This season, which began January 14, 1977, The Meadows is paying out about 50% of the commission in purses.[1]

The Meadows attracts betting patrons from Pennsylvania, Ohio, West Virginia, and other states, and more than half of the 1300 to 1500 owners who race horses at The Meadows come from outside of Pennsylvania.

The Meadows provides stall space in several barn areas for the horses that are raced at the track. Stall assignments are made by WTA.

WTA makes purse payments only to owners of horses. In some instances, the owner of a horse acts as his own trainer and driver. In other cases, the owner places his horse with a trainer. If an owner places a horse with a trainer, the trainer receives his compensation from the owner, not from the track.

Defendant PHHA is a state-wide organization with about 1350 members. Defendant Western Pennsylvania Harness Horsemen's Association is a chapter of PHHA with about 550 members. Defendants

1. John Townsend, vice president and general manager of WTA, testified that in 1977 a typical purse is $1400, of which one-half is paid to the owner of the winning horse, one-quarter to the owner of the horse finishing in second place, 12% for third place, 8% for fourth place, and 5% for fifth place.

Wall, Beinhauer, McCandless and O'Brien are directors of PHHA. Defendant Imel is executive vice president of PHHA. Defendant Dempster, the PHHA representative at The Meadows, and defendant Quaglietta are employees of PHHA. Defendants Wall, Katcher, Caumo, Stofan, Romanetti, and other individual defendants own, train and/or drive harness horses and have raced at The Meadows in past seasons.

WTA formerly had a contract with PHHA which governed the size of purses to be paid to owners who raced horses at The Meadows. The contract, which expired on December 31, 1976, also addressed several other matters related to purse distribution. WTA has taken the position that it will not negotiate another contract with PHHA because PHHA is not representative of the group of owners who race at The Meadows. WTA contends that on economic matters it deals directly with owners and not with trainers or drivers, and that PHHA is a state-wide organization whose membership includes individuals who are not owners and individuals who do not race at The Meadows. Twelve of the sixteen PHHA directors are from areas of the state other than Western Pennsylvania. WTA further contends that the 550 members of WPHHA include only a portion of the 1300 to 1500 owners who race at The Meadows. WTA asserts that it is willing to negotiate an agreement as to the size of purses with an organization made up of the owners who race at The Meadows.

Prior to the beginning of this racing season, PHHA held several meetings at a hotel near The Meadows. At these meetings, PHHA directors, representatives of harness horsemen's organizations from other states, and officials of Harness Horsemen's International (HHI) spoke to the owners, trainers and drivers in attendance. PHHA is one of the member groups of HHI. On January 7, 1977, at one of these meetings, defendant Charles Caumo said he would not enter horses in races at The Meadows unless PHHA had a contract with WTA. At the same meeting, defendant George Beinhauer stated that a complaint filed by PHHA with the state racing commission seeking revocation of WTA's license had been filed as a bluff to force the WTA to negotiate with PHHA.

Defendant James Imel spoke at meetings in the hotel and in the paddock. An owner who had attended the meetings testified that the speakers emphasized that if the horsemen would stick together as a group and refuse to race, then eventually the horsemen would win and a contract with PHHA would be signed. The owner testified that although Mr. Imel had said that each individual should make his own choice, it was clear that PHHA wanted the owners to refuse to race until a contract was signed. There was also testimony that owners were lead to believe that if they raced at The Meadows, they might jeopardize opportunities to race at other tracks and memberships in other harness horsemen's associations.

In early January, several full-page advertisements sponsored by other harness horsemen's associations appeared in nationally-circulated racing magazines. An advertisement signed by the Kentucky Harness Horsemen's Association and entitled "In Support of Pennsylvania Harness Horsemen's Association" read as follows:

> "Your horsemen's association is your strength. To race as individuals without an association will leave you without strength. You are as individuals being tempted by the 50 per cent horsemen's purse account offered by management rather than an offer to your association.
>
> "Remember this 50 per cent offer is an attempt to destroy your strength of organization. Management never offered horsemen 50 per cent until your association forced them to do so. Remember how often our horsemen raced for less than 35 per cent before your association forced management to give you a fair return.
>
> "Protect your organization and your strength. Do not race without a contract at The Meadows or any other raceway. Stay smart. Keep your strength. Remember you are not an employee of the

track, but instead are individual small businessmen banded together for mutual benefit.

"No one is as strong as all of us."

Advertisements sponsored by HHI and by the Michigan Harness Horsemen Association stated support for PHHA's efforts and activities at The Meadows.

On January 14, 1977, opening night at The Meadows, in contrast to the usual racing contingent of about 80 horses, only about 36 horses were entered in races. This resulted in a significant reduction in the number of races and, consequently a decrease in the amount of money wagered. A WTA officer testified that due to the state limitation on the number of days on which there can be racing at The Meadows, it will not be possible to make up the losses incurred as a result of this reduced participation. At least one of the owners who raced opening weekend was physically threatened by PHHA members because of his participation. There is evidence that picketing was planned in an effort to discourage patrons from attending the races. There is no evidence that any picketing occurred subsequent to the temporary restraining order issued by this court on the afternoon of January 14th which specifically prohibited picketing in support of a boycott aimed at interfering with plaintiff's business.

Some owners who desire to participate in racing at The Meadows have expressed concern for the security of their horses. In an effort to increase security, WTA has attempted to assign the racing horses and the non-racing horses to separate barn areas. The horses belonging to owners who are participating in the races are to be housed in a barn close to the track. However, defendant Wall and several other owners whose horses were housed in the barn area close to the track during the past season, have chosen not to race this season and have refused to move their animals to make room for the horses belonging to owners who are racing this year.

A copy of the agreement between PHHA and WTA dated April 10, 1970, submitted as an exhibit, contains provisions on: basic purse distribution, projection of purses and carry-over of purse money, minimum purses, maximum purses for stake and early closing events. Purses were to be 41% to 43% of WTA's share plus an additional 1% to be used to pay premiums for an insurance policy for trainers and drivers injured in racing. Additional provisions provided PHHA with office space at The Meadows and provided that WTA and PHHA would meet regularly to review proposed purse schedules. The agreement specified that nothing in the agreement was to be deemed to limit the absolute discretion of WTA to assign stall spaces.

## CONCLUSIONS OF LAW

The parallel business behavior of numerous PHHA members in refusing to race at The Meadows this season has interfered with the plaintiff's ability to provide racing to the public. Where businessmen concert their actions in order to deprive another of access to a product which he wishes to sell to the public, their activity is presumed to be illegal as an unreasonable restraint of trade. *United States v. General Motors Corp.*, 384 U.S. 127, 146–147, 86 S.Ct. 1321, 16 L.Ed.2d 415 (1966); *Northern Pacific Ry. v. United States*, 356 U.S. 1, 5, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958); *De Filippo v. Ford Motor Company*, 516 F.2d 1313, 1316–1318 (3rd Cir. 1975).

Not all parallel business behavior, however, amounts to unlawful concerted activity. It is necessary to consider whether the parallel acts by the defendants are in contradiction of their own economic interests and whether there was any motivation for the defendants to enter such an agreement. *Venzie Corp. v. United States Mineral Products Co., Inc.*, 521 F.2d 1309, 1314 (3rd Cir. 1975). At the hearing on plaintiff's motion, there was sufficient evidence as to each of these elements to support a reasonable probability that plaintiff ultimately will prevail on the merits. Those owners who have foregone racing this season have done so even though The Meadows has raised the size of purses this year. PHHA members raced last year under a

contract providing for purses of about 44%. This year, many are refusing to race for the purses of about 50% which WTA is now paying. The defendants' desire to have PHHA recognized as the bargaining agent for individuals racing at The Meadows appears to have been a strong motivation for the recent actions of the PHHA members.

■ The defendants argue that it is this traditional labor motivation which provides them with an exemption from the anti-trust laws. However, there has bee no showing that an employer-employee relationship forms the matrix of the controversy between WTA and PHHA. *Columbia River Packers Association v. Hinton,* 315 U.S. 143, 145–147, 62 S.Ct. 520, 86 L.Ed. 750 (1942); *Conley Motor Express, Inc. v. Russell,* 500 F.2d 124, 126–127 (3rd Cir. 1974). On the basis of the evidence now before the court, this cannot be considered a labor dispute within the terms of the Norris-LaGuardia Act, 29 U.S.C. § 101. The previous contract was almost exclusively concerned with how purses were to be distributed to the owners of horses. It was not an employment contract and it did not deal with the hours, wages or working conditions of trainers, grooms or anyone else.[2] Indeed, while the trainers do work at The Meadows, they do not work for The Meadows. They are paid by the owners for whom they work. Likewise, the owners themselves must be considered independent businessmen rather than employees of WTA. *See Taylor v. Local 7, International Union of Journeymen Horseshoers,* 353 F.2d 593 (4th Cir. 1965). While there is nothing illegal in the desire of this "group of entrepreneurs" to have a single agent represent them, *Yonkers Raceway v. Standardbred Owners Association,* 153 F.2d 552, 555 (S.D.N.Y.1957), that desire does not exempt them from the anti-trust prohibitions against group boycotts.

■ Thus, while each owner, trainer and driver remains free to choose for himself whether or not he will race at The Meadows, an order will be issued enjoining the defendants from endeavoring to induce other individuals to refuse to participate in the racing events at The Meadows. The issuance of such a preliminary injunction is justified by the plaintiff's showing that: (1) there is reasonable probability that the plaintiff will succeed in proving that the defendants have acted through the PHHA to promote a group boycott at The Meadows; (2) the plaintiff has suffered and may continue to suffer injury to its business by this *per se* unreasonable restraint of trade, and such losses cannot be made up this season due to the limited number of racing days available under plaintiff's license from the state; (3) there is a possibility of harm to other persons and their horses involved in racing at The Meadows if an injunction is not granted, and, (4) there have been threats of physical harm and blacklisting which are contrary to the public interest. The plaintiff has satisfied the standard for preliminary injunctive relief. See *Delaware River Port Authority v. Transamerican Trailer Transport, Inc.,* 501 F.2d 917, 919–920 (3rd Cir. 1974).

The preliminary injunction will enjoin the defendants from threatening or harassing those owners, trainers, and drivers who do choose to race at The Meadows. The prohibition against picketing at The Meadows by the defendants for the purpose of interfering with plaintiff's business by discouraging patrons will be continued in effect pendente lite. *Otto Milk Company v. United Dairy Farmers Coop. Association,* 388 F.2d 789, 798–799 (3rd Cir. 1967).

■ Finally, in light of the general rule that a court of equity which has jurisdiction over the parties to a controversy may decide all matters in dispute and decree complete relief, *Alexander v. Hillman,* 296 U.S. 222, 241–242, 56 S.Ct. 204, 80 L.Ed. 192 (1935), this court can properly decide the issue raised with respect to the allocation of stall spaces and the refusal of some individuals to remove their horses from certain stalls at The Meadows. This matter will be

2. The NLRB will not assert jurisdiction of matters involving the horse-racing industry due to the extensive state regulation of the industry and the pattern of short-term employment characteristic of the industry. See 29 C.F.R. § 103.3.

considered with all of the other issues at the final hearing in this action. An order will be entered at this time directing that any defendant who is requested by the WTA to move his horse to another stall or another barn at The Meadows, shall do so within 72 hours after receiving written notice from the plaintiff.

An appropriate order will be entered.