

1994 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

5-13-1994

# Pastore, et al v. The Bell Telephone Company

Precedential or Non-Precedential:

Docket 93-3556

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1994

Recommended Citation

"Pastore, et al v. The Bell Telephone Company" (1994). *1994 Decisions.* Paper 16.
http://digitalcommons.law.villanova.edu/thirdcircuit_1994/16

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1994 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT

_____

NO. 93-3556
_____

GARY L. PASTORE, an individual;
NATIONAL SECURITY SYSTEMS CORPORATION,
a Pennsylvania corporation,

Appellants

v.

THE BELL TELEPHONE COMPANY OF PENNSYLVANIA,
a Pennsylvania corporation; BELL ATLANTIC CORPORATION,
a Delaware corporation; RONALD DONALDSON,
ROBERT S. FADZEN, JR.; RAYMOND J. WICKLINE;
GEORGE CALDWELL
_____

On Appeal from the United States District Court
for the Western District of Pennsylvania
(D.C. Civil No. 92-00923)
_____

Submitted Under Third Circuit LAR 34.1(a)
May 2, 1994

Before:  SLOVITER, Chief Judge, HUTCHINSON,
and SEITZ, Circuit Judges

(Filed:  May 16, 1994)
_____

John R. Orie, Jr.
Orie & Zivic
Pittsburgh, PA  15219

        Attorney for Appellants

Richard B. Tucker, III
Jeffrey J. Leech
Diane Hernon Chavis
Tucker Arensberg, P.C.
Pittsburgh, PA  15222

        Attorney for Appellees
        Bell Telephone Co. of Pennsylvania;

1

Bell Atlantic Corp.; Ronald Donaldson;
Raymond J. Wickline; George Caldwell
Ralston S. Jackson
Odermatt & Jackson
Pittsburgh, PA  15219

Attorney for Appellee
Robert S. Fadzen, Jr.

OPINION OF THE COURT

SLOVITER, Chief Judge.


Gary Pastore and National Security Systems Corporation (NASSCO), plaintiffs-appellants, appeal from the entry of summary judgment in favor of defendants-appellees Bell Atlantic Corporation, its subsidiary, Bell Telephone Company of Pennsylvania, and four individual employees on plaintiffs' attempted monopolization claim under section 2 of the Sherman Act, 15 U.S.C. § 2 (Supp. IV 1992).

I.

**FACTS AND PROCEDURAL HISTORY**

The facts in this case are, for the most part, not in dispute.  Pastore established NASSCO in early 1986 to install a sophisticated custom-designed access control communications security network (CDACCSN) for Bell of Pennsylvania, which awarded it a contract for thirty of its facilities.  Bell of Pennsylvania told Pastore that it planned to order the same system for all of its 800 facilities if this pilot project was successful and that it might extend to as many as 4,000 facilities in other subsidiaries of Bell Atlantic.

2

The pilot project was timely completed and Bell of Pennsylvania officials expressed satisfaction with NASSCO's performance. Thereafter, they repeatedly asked NASSCO to surrender the computer source codes and specific proprietary information and technical designs relating to the CDACCSN which NASSCO declined to do, but because Bell of Pennsylvania insisted on some guarantees in the event of NASSCO's bankruptcy, NASSCO agreed to deposit in escrow the requested proprietary information.

Nonetheless, Bell of Pennsylvania ceased doing business with NASSCO and told NASSCO in March 1990 that a project for a Pittsburgh facility had been placed "on hold." In December 1990, Pastore was informed that a security system had been installed by an entity entitled Integrated Access Systems in the Monroeville Revenue Accounting Center, although the site was within the network of facilities to be installed and serviced exclusively by NASSCO. Other already-approved projects which were part of the first planned phase involving installation of the CDACCSN statewide were not carried forward, while none of the work planned for the second or third phase was initiated.

Plaintiffs filed this action in the District Court for the Western District of Pennsylvania alleging that defendants attempted to monopolize the relevant market in violation of section 2 of the Sherman Act[1], as well as under a variety of

---

[1]Section 2 provides:

> Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other

3

pendent state law tort and contract theories.[2]  Defendants moved

to dismiss for failure to state a claim under the Sherman Act.

The district court issued an order converting the motion to

dismiss into a motion for summary judgment as to the Sherman Act

claim only.  After granting plaintiffs two extensions for further

discovery, the court granted the summary judgment motion, holding

that the plaintiffs had produced no evidence of a dangerous

probability of the defendants monopolizing the relevant market,

and dismissed the pendent state law claims without prejudice.

Plaintiffs filed this timely appeal.

## II.

### DISCUSSION

#### A.

### Additional Discovery

Throughout their brief, plaintiffs argue that summary

judgment was inappropriate because they did not have adequate

time for discovery.  As this court has previously noted, we

review a claim that the district court has prematurely granted

summary judgment for abuse of discretion.  See Radich v. Goode,

886 F.2d 1391, 1393 (3d Cir. 1989).  If a party believes that

---

> person or persons, to monopolize any part of the trade
> or commerce among the several States, or with foreign
> nations, shall be deemed guilty of a felony . . . .

15 U.S.C. § 2.

[2]The twelve count complaint included claims for defamation,
promissory estoppel, anticipatory breach of contract, breach of
contract, breach of duty of good faith, common law fraud and
deceit, tortious interference with contractual and business
relations, tortious bad faith and unfair dealing, interference
with prospective economic advantage, and intentional infliction
of emotional distress.

s/he needs additional time for discovery, Fed. R. Civ. P. 56(f) specifies the procedure to be followed,[3] and explicitly provides that the party must file an affidavit setting forth why the time is needed. Plaintiffs concede, however, that they did not submit an affidavit. This concession is usually fatal, because by not filing "a Rule 56(f) affidavit, [they have] not preserved [their] objection to [their] alleged inability to obtain necessary discovery." Falcone v. Columbia Pictures Indus., Inc., 805 F.2d 115, 117 n.2 (3d Cir. 1986).

Plaintiffs contend that their brief opposing the defendants' motion for summary judgment constructively meets Rule 56(f)'s affidavit requirement. In the past we have rejected such arguments because "Rule 56(f) clearly requires that an affidavit be filed. 'The purpose of the affidavit is to ensure that the nonmoving party is invoking the protection of Rule 56(f) in good faith and to afford the trial court the showing necessary to assess the merit of a party's opposition.' An unsworn memorandum

---

[3]Federal Rule of Civil Procedure 56(f) provides:

> Should it appear from the affidavits of a party opposing the motion [for summary judgment] that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or may make such other order as is just.

(emphasis added).

opposing a party's motion for summary judgment is not an affidavit." Radich, 886 F.2d at 1394 (citations omitted).[4]

Even if we were to regard the request in plaintiffs' brief opposing the defendants' motion for summary judgment that the court "belay [summary judgment] until a more complete factual record is developed," Plaintiff's Supplemental Memorandum of Law in Opposition to Motion for Summary Judgment, Docket No. 33 at 13, as the functional equivalent of a Rule 56(f) affidavit, see St. Surin v. Virgin Island Daily News, Inc., No. 93-7553, 1994 WL 131201 at *3 (3d Cir. Apr. 15, 1994), the district court did not err in considering defendants' motion for summary judgment because plaintiffs did not specify "what particular information is sought; how, if uncovered, it would preclude summary judgment; and why it has not previously been obtained." Dowling v. City of Philadelphia, 855 F.2d 136, 140 (3d Cir. 1988).

Plaintiffs stated in their brief in the district court that a deposition of defendant Fadzen would demonstrate specific intent to monopolize. They claimed that Fadzen "may be a source of information not only as to specific intent but as to the product and the market as well, given his involvement with vendors and knowledge of software." Docket No. 33 at 12 n.11. Even assuming that plaintiffs were referring to the defendants'

---

[4]Plaintiffs claim that the circumstances in this case are "somewhat similar" to Miller v. Beneficial Management Corp., 977 F.2d 834, 846 (3d Cir. 1992), where we held that the plaintiff's reliance on a Magistrate Judge's order waiving the Rule 56(f) affidavit requirement permitted this court to review the district court's termination of discovery, but we see no similarity (and plaintiffs have not articulated any) other than the fact that in neither case was an affidavit properly filed.

market power, the issue relevant here, it would be insufficient under Rule 56(f). Such an amorphous allegation fails to explain what plaintiffs expected to discover, how it applied to their case and why they could not obtain that information elsewhere.

The district court granted summary judgment in this case because the defendants had not entered the relevant market and thus had no market power. Plaintiffs have not explained on appeal why information as to any entry by Bell of Pennsylvania was available only through Fadzen nor what other attempts plaintiffs made to discover this information. It is not readily apparent, for example, why Pastore himself was unable to submit an affidavit with such information. We therefore decline to reverse the district court's decision to consider the summary judgment motion, when plaintiffs failed to move beyond mere generalities in their attempt to delay that consideration.

B.

### Standards for Summary Judgment

We review the districts court's decision to enter summary judgment de novo, applying the same standard as the district court. Once the moving party has carried the initial burden of showing that no genuine issue of material fact exists, see Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986), the nonmoving party cannot rely upon conclusory allegations in its pleadings or in memoranda and briefs to establish a genuine issue of material fact. Instead, it "must make a showing sufficient to establish the existence of every element essential to his case, based on the affidavits or by the depositions and admissions on

7

file." Harter v. GAF Corp., 967 F.2d 846, 852 (3d Cir. 1992). It is true, however, that "[i]nferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." Big Apple BMW, Inc. v. BMW of North America, Inc., 974 F.2d 1358, 1363 (3d Cir. 1992), cert. denied, 113 S. Ct. 1262 (1993).

Although we have stated in the past that summary judgment should be used sparingly in antitrust litigation because of the fact-intensive nature of such claims, see Harold Friedman, Inc. v. Kroger Co., 581 F.2d 1068, 1080 (3d Cir. 1978), more recently we have taken note that "many courts, including the Supreme Court, have . . . held defendants entitled to summary judgment in antitrust cases," and that despite the "factually intensive" nature of antitrust cases "the standard of Fed. R. Civ. P. 56 remains the same." Town Sound & Custom Tops, Inc. v. Chrysler Motors Corp., 959 F.2d 468, 481 (3d Cir.) (in banc) (citations omitted), cert. denied, 113 S. Ct. 196 (1992). In fact, the Supreme Court has recently affirmed that there is no "special burden . . . [for] summary judgment in antitrust cases." Eastman Kodak Co. v. Image Technical Servs., Inc., 112 S. Ct. 2072, 2083 (1992).

C.

**Dangerous Probability of Achieving Monopoly Power**

The Supreme Court has recently restated the necessary elements to state a claim under section 2 of the Sherman Act. "[T]o demonstrate attempted monopolization a plaintiff must prove

8

(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power." Spectrum Sports, Inc. v. McQuillan, 113 S. Ct. 884, 890-91 (1993) (citing 3 Phillip Areeda & Donald F. Turner, Antitrust Law ¶ 820 at 312 (1978)).

The district court granted summary judgment based on the failure of the plaintiffs to meet the "dangerous probability" requirement, and this is the only issue before us on appeal. Determining whether a "dangerous probability" exists requires "inquiry into the relevant product and geographic market and the defendant's economic power in that market." Spectrum Sports, 113 S. Ct. at 892.

The plaintiffs have the burden of defining the market. See Tunis Bros. Co., Inc. v. Ford Motor Co., 952 F.2d 715, 726 (3d Cir. 1991), cert. denied, 112 S. Ct. 3034 (1992). Plaintiffs claim that the relevant market is the very narrow one of the CDACCSN itself, see Appellants' Brief at 15 ("the NASSCO product . . . constitute[s] the relevant market"),[5] and that they themselves hold a monopoly over the CDACCSN. Id. at 14-15 ("NASSCO possessed monopoly power as to this product market"). Indeed, plaintiffs vigorously assert that the CDACCSN was a unique system that was incomparable to all others then or since

---

[5]At other times plaintiffs have argued the market should be "dial up, computer driven remotely-monitored card-access security systems in the geographic region served by Bell Atlantic." Memorandum of Law in Response to Defendants' Motion to Dismiss, Docket No. 11 at 6-7 n.2; see also App. at 24 (Complaint) ("remotely monitored security devices").

on the market.  App. at 110 (Pastore Affidavit) ("As late as 1990, it was believed that the system was unprecedented and unique . . . .  Since 1990 other suppliers have advertised similar features . . . .  However, NASSCO is not aware of any installation which duplicates all of the unique features of the NASSCO system installed at Bell of PA.").[6]

For purposes of the matter before us, we hold plaintiffs to their own contention, see Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 117 (3d Cir. 1980) (plaintiff bound by relevant market analysis proposed to district court), cert. denied, 451 U.S. 911 (1981), and we assume arguendo that the plaintiffs have demonstrated this to be the appropriate market definition.

Plaintiffs must thus show that the defendants possessed "sufficient market power" to come dangerously close to success within that market.  Fineman v. Armstrong World Indus., Inc., 980 F.2d 171, 197 (3d Cir. 1992), cert. denied, 113 S. Ct. 1285 (1993); Barr Labs., Inc. v. Abbot Labs., 978 F.2d 98, 112 (3d Cir. 1992).  There is no simple formula:  factors to be reviewed "include the strength of the competition, probable development of the industry, the barriers to entry, the nature of the anti-

_____

[6]See also Pastore Affidavit, Docket No. 21 at 6 ("At the time of the misconduct by Bell, to the best of my knowledge, NASSCO was the only supplier of such an integrated access control product."); Plaintiffs' Br. in Opposition to Motion for Summary Judgment, Docket No. 22 at 5 n.3 ("This is not an instance of a superior product among inferior competing products.  It is an instance of a product without competitors."); Plaintiffs' Supplemental Memorandum of Law in Opposition to Motion for Summary Judgment, Docket No. 33 at 3 ("the NASSCO product constituted a unique product without parallel or substitute").

10

competitive conduct, and the elasticity of consumer demand." Id. at 112. Most significant, however, is the defendants' share of the relevant market. See id. (collecting cases). Indeed, a pair of the leading antitrust commentators state that "it is clear that the basic thrust of the classic rule is the presumption that attempt does not occur in the absence of a rather significant market share." Areeda & Turner, supra, ¶ 831 at 336.

The defendants have submitted an affidavit which states they are not "engaged in the businesses of (i) remotely monitoring security alarms or (ii) the manufacture, sale or provision of equipment used to remotely monitor alarms or card access security systems." App. at 70. The plaintiffs offer no evidence that the defendants have entered the CDACCSN market. Indeed, they have confined their discussion to defendants' future entry into the market. See, e.g., App. at 24 (Complaint) (defendants are "intent upon entering); App. at 119 (Pastore Affidavit) ("in the event that Bell Atlantic is determined to enter into the alarm monitoring market"); Memorandum of Law in Response to Defendants' Motion to Dismiss, Docket No. 11 at 2 (defendants are "poised to enter"). Thus, it is clear that the defendants presently have no share of the CDACCSN market.[7]

---

[7] Plaintiffs' position as to the only specific facility that they did not install, the one at the Monroeville Revenue Accounting Center, is unclear. Even if this system was "pirated" from NASSCO, see Pastore Affidavit, Docket No. 21 at 9-10 (defendants "were simultaneously meeting with another contractor, using NASSCO's engineering design for the MRAC"); Plaintiffs' Br. in Opposition to Motion for Summary Judgment, Docket No. 22 at 12 ("an unsuccessful effort by defendants' to mimic the NASSCO product and install and implement that pirated technology at [MRAC]"), there is no evidence that the defendants attempted to

11

Without any share in the relevant market as described by plaintiffs, there can be no inference that defendants hold sufficient economic power in that market to create a dangerous probability of monopoly. See Nuemann v. Reinforced Earth Co., 786 F.2d 424, 428 (D.C. Cir.), cert. denied, 479 U.S. 851 (1986); see also Fineman, 980 F.2d at 201.

Plaintiffs argue that where there is high degree of predatory conduct coupled with a transparent intent to monopolize, the courts have required a less rigorous showing of market power. They cite Otto Milk Co. v. United Dairy Farmers Coop. Ass'n, 388 F.2d 789 (3d Cir. 1967), for this proposition, but nothing in that case supports this view. In Otto Milk the defendants argued that they were not liable because they did not in fact have a monopoly and we simply held that an attempt claim under Section 2 "does not require an actual monopoly of the territory sought." Id. at 798.

Three sources relied upon by the plaintiffs do support their position. A well-known 1956 law review article by Professor Turner argued that if "defendants are attempting to drive someone out of the market by foul means rather than fair, there is ample warrant for not resorting to any refined analysis as to whether . . . having taken over all the production of a particular commodity, the defendants would still face effective competition from substitutes." Donald F. Turner, Antitrust

market this system to others. The internal use at one site of the NASSCO product is insufficient to indicate a dangerous probability of achieving monopoly power.

12

Policy and the Cellophane Case, 70 Harv. L. Rev. 281, 305 (1956); see also Edwin S. Rockefeller, Antitrust Questions and Answers 27 (1974) ("If a sufficiently evil intent can be shown--to destroy or exclude a competitor, control prices, or coerce customers or suppliers--the Court might not look for any relevant market beyond the product immediately involved."). And the district court in Rea v. Ford Motor Co., 355 F. Supp. 842, 876-77 (W.D. Pa. 1973), rev'd, 497 F.2d 577 (3d Cir.), cert. denied, 419 U.S. 868 (1974), held that a finding of dangerous probability of monopoly was unnecessary when overwhelming evidence of specific intent to monopolize existed.

However, we reversed the district court in Rea and noted that a showing of "a dangerous probability of achieving monopolization in a relevant market" was necessary to prevail on a section 2 claim. 497 F.2d at 590 n.28. More generally, the principle proposed by the sources on which plaintiffs rely was that adopted by the Ninth Circuit in Lessig v. Tidewater Oil Co., 327 F.2d 459, 474-75 (9th Cir.), cert. denied, 377 U.S. 993 (1964), a decision this court rejected in Coleman Motor Co. v. Chrysler Corp., 525 F.2d 1338, 1348 n.17 (3d Cir. 1975), and again in Edward J. Sweeney & Sons, Inc. v. Texaco, Inc., 637 F.2d 105, 117 (3d Cir. 1980), cert. denied, 451 U.S. 911 (1981).

Further, the Supreme Court unanimously interred Lessig in Spectrum Sports. In reversing a Ninth Circuit opinion which relied on Lessig, it held that intent to monopolize alone "is not sufficient[] to establish the dangerous probability of success that is the object of § 2's prohibition of attempts." Id. at

13

890. It explained that the "law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. . . . Thus, this Court and other courts have been careful to avoid constructions of § 2 which might chill competition, rather than foster it. . . . For these reasons, § 2 makes the conduct of a single firm unlawful only when it actually monopolizes or dangerously threatens to do so. The concern that § 2 might be applied so as to further anticompetitive ends is plainly not met by inquiring only whether the defendant has engaged in 'unfair' or 'predatory' tactics." Id. at 892 (citations omitted).

In any event, this is not the case in which we must consider whether predatory actions by defendants may reduce the amount of market share that is needed to show a dangerous probability of success. Having shown no market share by defendants, plaintiffs have nothing to couple with their alleged predatory behavior.

Accepting everything the plaintiffs say as true, it is ironic that they basically seek to protect their own monopoly power in the field of dial-up, computer-driven remotely-monitored card-access security systems by use of an antitrust suit. To the extent that plaintiffs may have rights to the product of their creativity and initiative, there are other legal doctrines to protect them. On this record, the district court did not err in holding that they have not shown enough to proceed further under the Sherman Act.

III.

14

For the foregoing reasons we will affirm the judgment and order of the district court.