

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

12-30-1999

# Annulli v. Panikkar

Precedential or Non-Precedential:

Docket 98-7449

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Annulli v. Panikkar" (1999). *1999 Decisions.* Paper 334.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/334

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed December 30, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 98-7449

DOMINICK ANNULLI and JANET ANNULLI, his wife,
individually and trading and doing business as
ANNULLI NURSERIES,
Appellants

v.

ANANDA K. PANIKKAR and LINGA D. PANIKKAR, his wife,
WILLIAM C. WRIGHT and JOANNE WRIGHT, his wife;
EVERGREEN EXPRESS, INC.; LAWRENCE D. WRIGHT
and LISA WRIGHT

On Appeal From the United States District Court
For the Middle District of Pennsylvania
(D.C. Civ. No. 96-cv-01161)
District Judge: Honorable Malcolm Muir

Argued: November 4, 1999

Before: BECKER, Chief Judge, GREENBERG, and
CUDAHY,* Circuit Judges.

(Filed December 30, 1999)

_____

* Honorable Richard D. Cudahy, United States Circuit Judge for the
Seventh Circuit, sitting by designation.

FRANKLIN E. KEPNER, JR.,
 ESQUIRE (ARGUED)
ALICE T.K. CORBA, ESQUIRE
Kepner, Kepner & Corba
123 West Front Street
Berwick, PA 18603

Counsel for Appellants

JOHN J. SOROKO, ESQUIRE
 (ARGUED)
TERESA N. CAVENAGH, ESQUIRE
Duane, Morris & Heckscher, LLP
One Liberty Place
Philadelphia, PA 19103-7396

JOSEPH P. LENAHAN, ESQUIRE
Lenahan & Dempsey
Suite 400, Kane Building
116 North Washington Avenue
P.O. Box 234
Scranton, PA 18501-0234

LISA WILSON, ESQUIRE
251 Shadowlawn Avenue
Mount Lebanon, PA 15216

Counsel for Appellees

OPINION OF THE COURT

BECKER, Chief Judge.

The principal question presented by this appeal is whether torts, breaches of contract, and state law crimes-- which are not enumerated in the Racketeering Influenced and Corrupt Organizations Act (RICO), 18 U.S.C.S 1961(1) --can be predicate acts of racketeering upon which a plaintiff can base a civil RICO claim under 18 U.S.C. S 1964(c). We would have thought the answer to this question obvious, but, as evidenced by the case at bar, the question begs for definitive resolution. Accordingly, we take this opportunity to make clear that a plaintiff in a civil RICO action cannot rely on a breach of contract, tortious

2

interference with contract, or the Pennsylvania state law crime of theft by deception as predicate acts of racketeering activity under the federal RICO statute.

The appeal also requires that we clarify the time at which a cause of action accrues for statute-of-limitations purposes under the civil RICO statute. We confirm that the "injury and pattern" discovery rule announced by this Court in Keystone Ins. Co. v. Houghton, 863 F.2d 1125 (3d Cir. 1988), remains the law of the Circuit, notwithstanding the Supreme Court's decision in Klehr v. A.O. Smith Corp., 521 U.S. 179 (1997), which rejected an exception we had grafted on to Keystone's general rule. We note, however, that the Supreme Court has granted writ of certiorari in Rotella v. Wood, 147 F.3d 438 (5th Cir. 1998), cert. granted, 119 S. Ct. 1139 (1999), and will likely decide this Term what rule will control in the future: the injury and pattern discovery rule employed by this court of appeals and others; the "pure injury discovery" rule employed by other courts of appeals; the "injury rule" endorsed by Justices Scalia and Thomas in Klehr, 521 U.S. at 198 (Scalia, J., concurring); or some other rule.

Our determinations as to what constitutes a predicate act of racketeering activity and the time at which a civil RICO action accrues compel the conclusion that the District Court did not err in granting summary judgment for the defendants on plaintiffs-appellants' civil RICO claims. We further conclude that the District Court did not abuse its discretion under the supplemental jurisdiction statute, 28 U.S.C. S 1367(c), by dismissing plaintiffs' pendent state law claims after their predicate federal claims had been dismissed. Accordingly, the judgment of the District Court will be affirmed.

I. Factual Background and Procedural History

Doctors William Wright and Ananda Panikkar were friends and practicing physicians in Bloomsburg, Pennsylvania. Each owned adjoining land on the River Hill farm, where they grew Christmas trees for sale. Each man and his family also owned other tree farms. Wright's family formed a corporation to sell trees, Evergreen Express, Inc.

(Evergreen), while Panikkar sold trees under his own name. Until 1989, both families participated in the management of their farms but employed outside help to do much of the work. This arrangement proved erratic and generally unprofitable.

In 1989, Wright contacted Dominick Annulli, who was experienced in the tree farm business, and told him that he needed someone to manage his farm and to maintain and sell his trees. Annulli and Wright signed a written contract prepared by Wright's son, Lawrence, a lawyer, which provided that for a four-year term Annulli would be responsible for maintaining and selling Evergreen's trees. In return, Annulli would receive any profits from those sales after he paid Evergreen a base fee for each tree sold. During the course of the negotiations, Wright introduced Annulli to Panikkar, who agreed orally to enter into a similar arrangement with Annulli. Annulli successfully managed the farms for the next two years. In addition to selling Christmas trees, he expanded the Wrights' and the Panikkars' businesses to the non-holiday season by developing a market in dug and balled nursery stock trees. This new venture proved quite profitable for the families and Annulli, and it enabled the farms to have a stream of income year-round.

Not all remained merry, however, in the Christmas tree business. Annulli alleges that, although the Wrights' and Panikkars' farms were becoming quite successful, Wright's son, Lawrence, made Annulli's life miserable by constantly interfering with Annulli's management duties. Frustrated with Lawrence's intrusiveness, Annulli wrote to Wright and Evergreen on April 6, 1991, requesting that they terminate their agreement before the end of the term. Annulli's offer was not accepted, and he was told by the Wrights that they expected him to meet his obligations for the next two years.

Four months later, the Wrights and Evergreen "accepted" Annulli's offer to terminate the contract. They did so after a summer during which Annulli had labored and spent his own money to maintain the Wrights' trees. Annulli submits that the Wrights' acceptance of his offer to terminate was not only legally invalid, but was motivated by the Wrights' unlawful desire to profit at his expense. Annulli submitted

4

an affidavit prepared by one George Bellum, who represented that Wright had offered him a job to manage the Wrights' farms while Annulli was still engaged in doing so. Bellum also asserted that Lawrence Wright explained that the reason for replacing Annulli with Bellum was that, under their contract, Annulli was making all the money and the Wrights wanted to reap these profits.[1] Additionally, Bellum claimed that, after Annulli's contract was terminated, Lawrence Wright and his brother, Lee, tried to enlist Bellum in an attempt to use a price list stolen from Annulli to steal Annulli's customers for nursery stock trees.

Believing that the Wrights' actions constituted a breach of contract, Annulli sued Evergreen in Pennsylvania state court in November 1991. The case was purged from the state court's docket after two years for lack of prosecution. While Annulli's case against Evergreen languished in state court, Annulli's contractual relationship with Panikkar continued. Wright, who lived next to one of Panikkar's farms, began calling Panikkar and informing him that Annulli was not maintaining the Panikkars' trees, and that he was cutting and selling their trees without informing him. Panikkar visited his tree farms, and upon discovering what he perceived to be neglect, informed Annulli that he needed to take better care to meet his contractual obligations. The neglect is said to have persisted, and Panikkar terminated his agreement with Annulli in the Spring of 1993. Since then, the Wrights have performed maintenance and managerial duties at the Panikkars' farms.

In November 1994, Annulli filed suit against Panikkar and his wife in Pennsylvania state court for breach of contract.[2] On June 4, 1996, Annulli deposed Panikkar, who

_____

1. An accountant hired by Annulli prepared a report that supports Bellum's assertion that the Wrights wanted to appropriate Annulli's share of the profits. The accountant estimated that Annulli made roughly forty dollars on each tree he sold; under the terms of their contract, the Wrights made between $6.50 and $10 a tree.

2. Annulli, his wife, and Annulli Nurseries were named as plaintiffs in the cases relevant to this appeal. As Mr. Annulli is the principal plaintiff, we refer to him alone.

5

testified regarding his connection with the Wrights and about Wright's reports that Annulli was not doing his job properly. Based on this deposition and an interpretation of Panikkar's testimony that led to the conclusion that the Wrights and Panikkars had conspired to defraud Annulli, Annulli filed an amended complaint on July 15, 1996. The complaint added Wright, his wife, two of their children, and Evergreen as defendants. Annulli pled breach of contract claims against the Panikkars; he asserted claims against Evergreen and the Wrights for tortious interference with the Panikkar-Annulli contract; and he alleged that the Wrights and Panikkars had engaged in conspiracy and defrauded him. Annulli demanded four million dollars in damages for anticipated lost profits from his share of the trees on the Panikkar farms which Annulli had planted and maintained, but which the Wrights and Panikkars were now selling.

On June 24, 1996, Annulli began proceedings against the Wrights, Panikkars, and Evergreen (hereinafter "the Defendants") in the District Court for the Middle District of Pennsylvania; he averred civil RICO claims as well as pendent state law claims. (Annulli's counsel represented at oral argument that these state law claims are currently pending in state court.) In his RICO action, Annulli alleged that the Wrights and the Panikkars engaged in a conspiracy between 1983 and 1993 to steal Annulli's services and expertise. He alleged that he first discovered this conspiracy and pattern of racketeering during the June 4, 1996 deposition of Panikkar.

The Defendants moved for summary judgment, and the District Court granted it based on the statute-of-limitations defense they had advanced. The Court held that Annulli's civil RICO action against the Defendants accrued in 1991 when the Wrights terminated their contract with Annulli and published an allegedly stolen price list. At this moment, the District Court concluded, Annulli knew or should have known the Defendants had engaged in acts forming the predicate acts of racketeering, on which a civil RICO claim could be based. Under this reasoning, since Annulli waited until 1996 to file suit to recover damages arising out of this alleged pattern of racketeering, his claim was time-barred by RICO's four-year statute of limitations.

6

In reaching this conclusion, the District Court rejected Annulli's arguments that he first discovered the RICO conspiracy against him during the June 6, 1996 deposition of Panikkar. The Court concluded that nothing in the deposition supported the contention that the Wrights and Panikkars had decided unlawfully to transfer management duties of the farm to the Wrights; therefore, there was nothing for Annulli to discover. Moreover, even if the deposition contained new evidence that the Wrights persuaded the Panikkars to terminate their contract with Annulli: (1) the Court suggested that this act did not constitute a predicate RICO violation, but merely tortious interference with contract; and (2) it concluded that even if there were a RICO violation, the statute of limitations would not start running upon its discovery, but upon the discovery of the first act of the conspiracy and its attendant injury—the Wrights' 1991 decision to terminate its agreement with Annulli and publish a stolen price list. Having dismissed Annulli's federal claims, the Court exercised its discretion to dismiss his pendent claims as well.

Annulli appealed. We have appellate jurisdiction pursuant to 28 U.S.C. S 1291. The District Court had subject matter jurisdiction under 18 U.S.C. S 1964(c) and 28 U.S.C. SS 1331 and 1367.3

_____

3. The District Court disposed of all of Annulli's civil RICO claims on summary judgment. We exercise plenary review over such a decision, see Olson v. General Elec. Astrospace, 101 F.3d 947, 951 (3d Cir. 1996), and apply the same test the District Court should have applied in the first instance, see Lawrence v. National Westminster Bank, New Jersey, 98 F.3d 61, 65 (3d Cir. 1996). We must therefore determine whether the record, when viewed in the light most favorable to Annulli, shows that there is no genuine issue of material fact and that defendants are entitled to judgment as a matter of law. See Salley v. Circuit City Stores, Inc., 160 F.3d 977, 980 (3d Cir. 1998).

II. The Defendants' Statute-of-Limitations Defense

A. The Applicable Accrual Rule for Civil RICO Claims

In enacting RICO, Congress did not include a statute-of-limitations provision for private civil claims arising under the statute. The Supreme Court filled this gap in Agency Holding Corp. v. Malley-Duff & Associates, Inc., 483 U.S. 143, 156 (1987), holding that civil RICO actions are subject to the four-year statute-of-limitations provision that governs private civil antitrust actions. The Court in Malley-Duff, however, did not announce when a civil RICO action "accrues"--i.e., the time at which the four-year statute of limitations begins to run.

The courts of appeals have adjudicated this question, but a split in authority has developed. In Keystone Ins. Co. v. Houghton, 863 F.2d 1125, 1130 (3d Cir. 1988), we announced the "injury and pattern discovery" rule. The rule provides that a civil RICO claim accrues and the statute of limitations begins to run when the plaintiff knew or should have known that each element of a civil RICO claim existed --namely, that he was injured, that the defendant was the source of this injury, and that a pattern of activity prohibited by RICO caused this harm. See id.; see also Klehr v. A.O. Smith Corp., 521 U.S. 179, 185 (1997) (noting that the 8th, 10th, and 11th Circuits follow this approach). Other courts of appeals have adopted the "pure injury discovery" rule; it does not require that the plaintiff have knowledge of a pattern of racketeering activity before the statute begins to run, but holds instead that a civil RICO cause of action accrues when the plaintiff discovers or should have discovered his injury. See Klehr, 521 U.S. at 191; see also id. at 185-86 (noting that the 1st, 2d, 4th, 7th, 9th, and likely the D.C. Circuits follow this approach); Rotella v. Wood, 147 F.3d 438 (5th Cir. 1998) (following this approach).

The Supreme Court seemed poised to resolve this circuit split in Klehr. Instead of doing so, however, the Court merely eliminated an exception to one of the two contending theories. The Klehr majority rejected this court's "last predicate act" exception to our general injury and

8

pattern discovery rule, see Keystone, 863 F.2d at 1130, while explicitly refusing to endorse either the injury and pattern discovery rule or the pure injury discovery rule. See Klehr, 521 U.S. at 182, 191.4 As Klehr purposefully avoided endorsing our general accrual rule in Keystone or rejecting it in favor of an alternative, Keystone remains the law of this Circuit unless and until the Supreme Court (or our court en banc) says otherwise. In applying Keystone, we note that it is the most lenient accrual rule among the remaining contenders. If the Court were to reject it in favor of a stricter rule, it would only be more difficult for Annulli to show that his claim is not time-barred.5 Therefore, we do not hesitate in applying Keystone, as we feel confident that whatever result the Court reaches this Term in Rotella v. Wood, 147 F.3d 438 (5th Cir. 1998), cert. granted, 119 S. Ct. 1139 (1999); see also supra Introduction (discussing Rotella), the outcome of this case would remain the same.

_____

4. Our last predicate act exception, created in Keystone, 863 F.2d at 1130, allowed

> actions based on injuries occurring outside the limitations period if
> injuries that are derived from the same pattern of racketeering are within the limitations period. Likewise, predicate acts which [were]
> committed within the limitations period should provide a basis for civil RICO actions to redress a RICO injury occurring prior to the limitations period . . . .

The Supreme Court rejected this rule because it provided plaintiffs with little incentive to investigate their claims. It also let the plaintiffs sit on their rights indefinitely and use the new predicate acts "as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the limitations period." Klehr, 521 U.S. at 190.

5. The Court in Klehr described Keystone's injury plus pattern discovery rule as a "larger hole" through which civil RICO plaintiffs would have to fit their cases and the pure injury discovery rule as a "smaller one." Klehr, 521 U.S. at 192. The third rule mentioned in Klehr creates a smaller hole still. Concurring, Justice Scalia noted that he would have adopted as the civil RICO accrual rule, the Clayton Act pure injury rule, which provides that a "cause of action accrues and the statute begins to run when a defendant commits an act that injures a plaintiff's business." See id. at 197-98.

B. The Injury and Pattern Discovery Rule Applied to
Annulli's Claims

In applying Keystone, we must discern when Annulli was
injured, when he knew or should have known about these
injuries, and when he knew or should have known about
the source and alleged pattern of racketeering that caused
his injuries. Annulli has complicated matters by advancing
alternative theories regarding the time at which the alleged
Wright-Panikkar conspiracy arose, the exact predicate acts
of racketeering that harmed him, and the time at which he
did or should have discovered this conspiracy and its
resulting harms.

Annulli's theory of the Wright-Panikkar conspiracy and
pattern of racketeering can be summarized as follows. In
1983, Wright convinced his wife and family and the
Panikkars to buy land for Christmas tree farms. In 1989,
Wright, in bad faith, contracted with Annulli in an attempt
to learn and eventually steal his business secrets; Wright
then encouraged Panikkar to do the same. The Wrights and
the Panikkars then made misrepresentations to Annulli
that convinced Annulli to render services on their behalf.
Once the Wrights and Panikkars had learned Annulli's
secrets, stolen his price lists, and exploited his labor,
Wright then caused Evergreen to breach its contract with
Annulli, and soon after, convinced the Panikkars to do
likewise. With Annulli out of the way, the two doctors and
their families could now take a greater share in the profits
of their tree businesses and steal Annulli's customers.

Annulli claims three separate injuries arising out of these
alleged conspiratorial activities. The first harm is said to
have taken place when the Wrights terminated Evergreen's
contract with Annulli in 1991 and used a price list stolen
from Annulli to sell a product that Annulli had developed
for the Wrights--the highly profitable dug and balled
nursery stock trees--to Annulli's nursery customers. This
harm would have arisen in 1991, when these alleged
misdeeds took place. Annulli's second claim is that he
relied on the Panikkars' and Wrights' fraudulent
representations that they would be in the tree business for
a long time, and thus devoted time, money, skill, and labor
to working on the Defendants' farms. This purported harm

10

--years of hard work exchanged for false promises--
continued to accrue as long as Annulli worked with the two
families: from 1989 to 1991 in the Wrights' case, and from
1989 to 1993 in the Panikkars' case. The final harm that
Annulli allegedly suffered is his lost ability, under Annulli's
separate contracts with the Wrights and the Panikkars, to
sell the trees he planted and maintained. Under this
liability theory, the Wrights harmed Annulli when they
canceled their contract in 1991; the Panikkars harmed
Annulli in 1993 when they did the same.

Under this court's pattern and injury discovery rule,
Annulli's action on his first claim of injury is time barred.
Annulli's putative civil RICO action against the Wrights for
terminating their contract, stealing a price list, and faxing
it across state lines in an effort to lure away Annulli's
customers arises out of injuries and an alleged pattern of
racketeering activity that took place during and before
1991. (Whether these acts would constitute a pattern of
racketeering activity for RICO purposes is discussed in Part
III, infra, in which we conclude that they likely do.)
According to an affidavit prepared by Annulli, he
discovered, in 1991, (1) that they were injured; (2) that the
Wrights and Evergreen were the source of this injury; and
(3) as explained in the margin, that the Wrights and
Evergreen engaged in a pattern of activity to steal Annulli's
price lists and customers.6 Because Annulli knew of these
three facts in 1991, an action on these claims accrued in
1991, see Keystone, 863 F.2d at 1130, and hence his

_____

6. In an affidavit, signed April 21, 1997, Dominick Annulli swore that

> [s]oon after the defendant Wrights terminated our contract and
> denied me access to the trees that I planted and maintained, I was
> contacted by one of my larger customers, Shemin Nurseries, Inc.,
> located in Connecticut, and they advised me that the defendant,
> Evergreen Express, Inc., had faxed a new price list to Shemin's
> office offering cut trees as well as dug and balled nursery trees.
> . . . In the same time period, . . . [the Defendants] were
attempting
> to steal my customers.

George Bellum, who submitted an affidavit on Annulli's behalf, averred
that the price list the Wrights sent to Annulli's customers was stolen
from Annulli.

11

attempt in June 1996 to remedy these injuries is barred by civil RICO's four-year statute of limitations.

Since Klehr rejected our last predicate act rule, see supra note 4, Annulli cannot rely on new injuries arising out of predicate acts of racketeering within the four years preceding June 1996 to recover for any injuries caused by these "earlier predicate acts that took place outside the limitations period." Klehr, 521 U.S. at 190. Therefore, the District Court rightly granted summary judgment in favor of the Wrights and Evergreen on this first--and untimely-- set of claims.

Annulli's other two sets of claims cannot be disposed of as easily. As Klehr also teaches, plaintiffs in civil RICO actions may seek redress for new injuries arising out of new predicate acts that occur within the statutory period, even if those new predicate acts and resulting injuries arise out of the same pattern of racketeering behavior that began outside the four-year statutory period. See Klehr, 521 U.S. at 189-90 (noting that under the "separate accrual" rule, adopted by some courts of appeals and applicable in antitrust law, plaintiffs could recover for new predicate acts occurring within the statutory period if they could show that the new acts could have caused them harm over and above the harm that the earlier acts caused). As explained above, the only limitation on this separate accrual rule is that these new acts cannot be used "as a bootstrap to recover for injuries caused by other earlier predicate acts that took place outside the statutory period." Id.

Under this framework, which is consistent with Keystone's general rule, Annulli's second and third claims would be timely, assuming that they were based on valid predicate acts of racketeering. The Defendants allegedly injured Annulli in 1993, when Wright purportedly convinced Panikkar to terminate his contract with Annulli and employ the Wrights to manage his farm. Annulli's years of labor for the Panikkars were now for naught because he could not share in the profits from the sales of the trees he planted and maintained, as was his contractual right.

Both of these injuries occurred within four years of the time that Annulli filed his civil RICO claims in June 1996,

12

and thus, the District Court erred in holding them untimely. The District Court rested its decision on the conclusion that Annulli was on notice of the Wright-Panikkar conspiracy when the Wrights terminated the contract and stole the price list in 1991. As the record demonstrates, however, Annulli continued to work with the Panikkars for the next two years without any indication that the Wrights and Panikkars were conspiring until either 1993, when the Panikkars canceled their contract, or 1996, when Annulli took Panikkar's deposition. Both of these discovery dates are within the four-year statutory period and fall under the separate accrual applied by the Court in Klehr. Therefore, the District Court erred in granting summary judgment for these claims on statute-of-limitations grounds.

III. Can State Law Crimes, Torts, and Breaches of Contract Constitute Predicate Acts of Racketeering

We may affirm a District Court's summary judgment ruling on different grounds, "provided the issue which forms the basis of our decision was before the lower court." Morse v. Lower Merion School District, 132 F.3d 902, 904 n.1 (3d Cir. 1998); see also Salley v. Circuit City Stores, Inc., 160 F.3d 977, 978 (3d Cir. 1998). In moving for summary judgment, the Defendants presented several alternative theories on which the District Court could dismiss Annulli's civil RICO claims. In addition to the statute-of-limitations argument adopted by the District Court, the Defendants contended that (1) the Panikkars' breach of their contract with Annulli, and the Wrights' alleged interference with that contract were not predicate acts of racketeering necessary for a civil RICO claim; (2) Annulli's alleged four million dollars of lost profits from future sales of trees on the Panikkars' farms were not proximately caused by the alleged RICO violation; and (3) Panikkar's wife and Wright's wife and daughter had nothing to do with the conspiracy. We focus our attention on the first of these arguments, because its resolution is dispositive of the remainder of Annulli's civil RICO claims.

13

## A. Annulli's Evidentiary Burden at Summary Judgment

Annulli's civil RICO claims arise under 18 U.S.C. SS 1962(c) and (d). Section 1962(c) provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." Under S 1962(d), it is unlawful "for any person to conspire to violate any of the provisions" of subsection (c). Therefore, to prove a conspiracy claim under S 1962(d), Annulli must first establish his S 1962(c) claim.

To recover under S 1962(c), a plaintiff must prove the following four elements: (1) the existence of an enterprise affecting interstate commerce; (2) that the defendant was employed by or associated with the enterprise; (3) that the defendant participated, either directly or indirectly, in the conduct or the affairs of the enterprise; and (4) that the defendant participated through a pattern of racketeering activity that included at least two racketeering acts. See Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985); Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162, 1165 (3d Cir. 1989). At the summary judgment stage of proceedings, if the movant--in this case the Defendants--can point to the absence of any factual support for one of these essential elements, then the non-movant, bearing the burden of persuasion at trial, must introduce specific facts showing a need for trial, pursuant to FED. R. CIV. P. 56(e). See Celotex, 477 U.S. at 322-24. If the non-moving party fails to go beyond conclusory allegations in its pleadings and to produce specific facts indicating that there is a genuine issue for trial, summary judgment will be granted in favor of the moving party. See id. at 323-24; Pastore v. Bell Telephone Co. of Pa., 24 F.3d 508, 512 (3d Cir. 1994). As noted above, we construe the record in the light most favorable to the non-moving party. See supra note 3.

## B. What Types of Acts Qualify as Racketeering Activity?

The Defendants point to an absence of factual support for the fourth element of Annulli's S 1962(c) civil RICO claim--

14

i.e., that the Defendants engaged in a pattern of racketeering activity. The Defendants argue that with respect to his last two claims of injury--those accruing in 1993--Annulli has, at most, provided factual support for state contract, tort, and criminal claims, but has not introduced any evidence of "racketeering activity" as it is defined by 18 U.S.C. S 1961(1).

The relevant portion of S 1961(1) defining "racketeering activity" provides, inter alia, that the term encompasses

> (A) any act or threat involving murder, kidnapping, gambling, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical . . . , which is chargeable under State law and punishable by imprisonment for more than one year; (B) any act which is indictable under any of the following provisions of title 18, United States Code: . . . section 1341 (relating to mail fraud), section 1343 (relating to wire fraud), . . . sections 2314 and 2315 (relating to interstate transportation of stolen property), . . .

18 U.S.C. S 1961(1). In Tabas v. Tabas, 47 F.3d 1280, 1290 (3d Cir. 1995) (en banc), we noted that Congress's inclusion of mail and wire fraud in subsection (1)(B) strikes some observers as sweeping "common law or `garden variety' fraud" claims that are normally "the subject of commercial litigation" into a statutory scheme aimed at punishing defendants who engage in crimes traditionally associated with racketeering, such as those enumerated in section (1)(A): murder, kidnapping, gambling, extortion, and the like. As Tabas recognized, however, we are bound by RICO's text and "the Supreme Court's instruction that `RICO is to be read broadly' "; therefore,"RICO, with its severe penalties, may be applicable to many `garden-variety' fraud cases, . . . particularly considering the judiciary's broad interpretation of the mail fraud statute." Id. at 1296- 97.

That said, Annulli has provided no evidence establishing that the Defendants engaged in racketeering activity within the statutory period. More particularly, Annulli has made no allegation that the Defendants committed one of the

15

state law crimes defined as racketeering activity in
S 1961(1)(A). He argues instead that the Defendants are
guilty of the Pennsylvania state law crime of "theft by
deception," 18 PA. CONS. STAT. S 3922, for stealing Annulli's
services in managing the tree farms. Even if Annulli could
make this showing, theft by deception, like a simple breach
of contract or intentional interference with contract, is not
a predicate act of racketeering activity enumerated in
S 1961(1).7 Even thoughS 1961 and its mail and wire fraud
predicates have been interpreted with flexibility, see Tabas,
47 F.3d at 1297, courts discussing the state crime of theft,
and its analogues, have refused to read it intoS 1961's
expansive list.8

This is for good reason. First, RICO's list of acts
constituting predicate acts of racketeering activity is
exhaustive. See, e.g., Harvey v. Harvey , 931 F. Supp. 127,
130 (D. Conn. 1996); Red Ball Interior Demolition Corp. v.

_____

7. See Brokerage Concepts, Inc. v. U.S. Healthcare, Inc., 140 F.3d 494 (3d
Cir. 1998) ("[D]efendant's heavy-handed business tactics, . . . while
relevant to a tortious interference claim, cannot be made to fit within
the
statutory and doctrinal constraints of the mail and wire fraud
statutes.");
Blount Financial Services, Inc. v. Walter E. Heller and Co., 819 F.2d 151,
152-53 (6th Cir. 1987) (holding that absent specific allegations of
intentional fraud, "[s]ending a financial statement which misconstrues
the prime rate provided by the terms of the contract may breach the
contract but it does not amount to a RICO mail fraud cause of action.").

8. See, e.g., United States v. Napoli, 54 F.3d 63, 68 (2d Cir. 1995)
(finding
that "despite the broad range of criminal offenses designated by the
money laundering statute, the crime of theft, standing alone, is not a
specified unlawful activity. It is neither a federal crime listed in
sections
1956 and 1961, nor one of the state-law offenses that constitute RICO
predicate acts."); Toms v. Pizzo, 4 F. Supp. 2d 178, 183 (W.D.N.Y. 1998)
(noting that "simple theft is not one of the crimes constituting a
predicate act for purposes of establishing a pattern of racketeering
activity"); Buck Creek Coal, Inc. v. United Mine Workers, 917 F. Supp.
601, 612 (S.D. Ind. 1995) ("[T]heft is not the type of act that forms a
predicate act under RICO."); Bonton v. Archer Chrysler Plymouth, Inc.,
889 F. Supp. 995, 1002 (S.D. Tex. 1995) ("Under RICO, . . . acts that
constitute theft under state law are not predicate acts for racketeering
activity. . . . A plaintiff may not convert state law claims into a
federal
treble damage action simply by alleging that wrongful acts are a pattern
of racketeering related to an enterprise.").

Palmadessa, 874 F. Supp. 576, 586 (S.D.N.Y. 1995). To read it otherwise would be to usurp the role of Congress in drafting statutes. Second, if garden-variety state law crimes, torts, and contract breaches were to constitute predicate acts of racketeering (along with mail and wire fraud), civil RICO law, which is already a behemoth, would swallow state civil and criminal law whole. Virtually every litigant would have the incentive to file their breach of contract and tort claims under the federal civil RICO Act, as treble damages and attorney's fees would be in sight. We will not read language into S 1961 to federalize every state tort, contract, and criminal law action.

As for those predicate acts listed in the statute, Annulli has provided no evidence that the Defendants engaged in S 1961(1)(B) mail fraud, wire fraud, or interstate transportation of stolen property during the four-year statutory period. He has adduced evidence that the Wrights stole Annulli's price list in 1991 and faxed it from Pennsylvania to one of Annulli's customers in Connecticut. See supra note 6. This may have the makings of wire fraud and interstate transportation of stolen property, which are enumerated predicate acts of racketeering in S 1961(1)(B). As noted in Section II.B, supra, however, a 1996 civil RICO action arising out of this predicate act is untimely by one year. That leaves Annulli with the Wrights' and Panikkars' alleged acts of conspiracy and racketeering in 1993 both to defraud Annulli of his labor and contractual rights with Panikkar, and to share the profits from tree sales to which Annulli was entitled. This intentionally fraudulent activity, if proven, might constitute mail or wire fraud if Annulli could also provide sufficient evidence that the Defendants used inter- or intrastate mail or interstate wire in furtherance of this scheme.[9] This they have not done.

_____

9. There are two elements of a mail or wire fraud charge: "(a) a scheme to defraud, and (2) a mailing or wire in furtherance of that scheme." Greenberg v. Brewster, 816 F. Supp. 1039, 1049 (E.D. Pa. 1993). Wholly intrastate use of the mails for fraud violates the mail fraud statute. See, e.g., In re Burzynski, 989 F.2d 733, 742 (5th Cir. 1993). In contrast, the federal wire fraud statute requires interstate use of the wire. See, e.g., Smith v. Ayers, 845 F.2d 1360, 1366 (5th Cir. 1988) ("As several courts have recognized, the statute requires that the wire communication cross state lines.").

17

Annulli sufficiently pled the elements of mail and wire fraud violations to survive judgment on the pleadings, but since then, he has introduced nothing into the record establishing that, "incident to an essential part of their scheme" to defraud him, Tabas, 47 F.3d 1294 n.18, the Defendants (1) mailed anything to one other or to Annulli, or (2) had phone communications with each other or with Annulli across state lines. The only mailings that Annulli has referenced include checks mailed to him for trees sold before 1991 and the 1991 letter the Wrights wrote to him terminating their contract. These mailings, while potentially acts of mail fraud under this court's expansive interpretation of the statute, see id., are outside the statutory period, see supra Section II.B.

All other communications between the parties appear to have occurred face to face or during intrastate telephone conversations, which are not covered under the wire fraud act. See supra note 9. Panikkar terminated his contract with Annulli in person. Wright informed Panikkar of Annulli's negligent work--and purportedly at the same time conspired with him to defraud Annulli--in a series of telephone conversations that were presumably intrastate, given that the two physicians are Bloomsburg, Pennsylvania neighbors. Annulli presented no evidence that these conversations between the Wrights and the Panikkars, or any other conversation in furtherance of their conspiracy to defraud Annulli, took place across interstate phone lines, as we detail in the margin.10  Accordingly,

_____

10. In his Reply Brief, Annulli asserts that such evidence can be found in his brief opposing summary judgment before the District Court. In those papers, Annulli claims that "[t]here were hundreds of calls to [him] from all over the country, outside the State of Pennsylvania requesting that he work faster and work harder for each of the Defendants." Annulli cites his own January 6, 1998 deposition at pages 89-91 to support this claim. On review, these pages contain no discussion regarding interstate phone calls made to Annulli by the Defendants. Instead, they include a discussion regarding the indemnity clause in Annulli's contract with the Wrights.

Annulli further asserted in his summary judgment opposition brief that "the Wrights operated their business schemes from Lake Placid, Florida during the winter months." From this, he would presumably have

18

Annulli's civil RICO claims based on predicate acts of wire
and mail fraud, which are unsupported by any record
evidence, cannot survive summary judgment.11

_____

us draw the inference that the Wrights called Annulli and furthered their
scheme to defraud him over interstate phone lines. To support the
contention giving rise to this inference, Annulli cites Exhibits 41 and 42
from the trial record and Joanne Wright's February 22, 1998 deposition
in its entirety. This evidence similarly fails to establish an issue of
material fact regarding Annulli's mail and wire fraud allegations. Exhibit
41 is a phone bill of an unidentified person or company dated April 10,
1990, on which a March 20, 1990 phone call is logged to Lake Placid,
Florida. Exhibit 42 is a canceled check written on March 11, 1989 from
Evergreen to United Telephone. Neither of these documents even begins
to prove that Wrights used interstate wire in furtherance of a conspiracy
to defraud Annulli, absent some explanation in the record as to why this
telephone bill and canceled check have anything to do with the
Defendants' alleged racketeering activity. Cf. Scheiner v. Wallace, 860 F.
Supp. 991, 997–98 (S.D.N.Y. 1994) (noting that, when alleging mail and
wire fraud as predicate acts in a RICO claim, plaintiff's pleadings must
identify the purpose of the mailing within the defendant's fraudulent
scheme and specify the fraudulent statement, the time, place, and
speaker and content of the alleged misrepresentations). Even if Annulli
did offer such explanations, the predicate acts of racketeering they would
tend to prove are well outside the statutory period. As for Joanne
Wright's 220 page deposition, it too provides Annulli with no assistance.
It makes not one mention of the Wrights operating their tree business
from Florida during the winter months; instead, it primarily contains
extensive discussions regarding the Wrights' unprofitable tree business
before they hired Annulli.

11. Annulli bemoans the fact that the Defendants"repeatedly refused to
turn over their telephone records as requested by him during discovery."
With these telephone records, Annulli suggests, he could have proven
that some of the allegedly conspiratorial telephone conversations were
conducted interstate. This is the wrong time to raise such an objection.
FED. R. CIV. P. 56(f) affords a party opposing summary judgment, who
has not had the time or means to discover facts necessary to defeat the
motion, the ability to ask the court to grant a continuance or deny the
motion altogether. The rule "specifies the procedure to be followed, and
explicitly provides that the party must file an affidavit setting forth
why
the time is needed." Pastore v. Bell Telephone Co. of Pa., 24 F.3d 508,
510–11 (3d Cir. 1994).

Annulli has filed no such affidavit. His failure to do so "is usually
fatal," because by not filing a Rule 56(f) affidavit, a plaintiff fails to

19

In sum, because Annulli has not produced any evidence showing that the Defendants engaged in a predicate act of racketeering within the statutory period, both hisS 1962(c) pattern of racketeering claims and his S 1962(d) conspiracy to racketeer claims were rightly rejected as a matter of law. We affirm the District Court's decision to grant summary judgment on Annulli's civil RICO claims in favor of the Defendants.

## IV. The Dismissal of Annulli's Pendent State Law Claims

Rejecting Annulli's civil RICO claims leaves his pendent state law claims against the Panikkars for breach of contract and those against the Wrights and Evergreen for intentional interference with contract. As noted above, the District Court dismissed these pendent claims after it granted summary judgment on Annulli's touchstone federal claims. Annulli argues that this decision was in error.

The supplemental jurisdiction statute governs our review. The statute provides that "[t]he district court may decline to exercise supplemental jurisdiction over a claim" if "the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. S 1367(c)(3). This administrative decision is left to the sound discretion of the district court, and we review such determinations for abuse of discretion, focusing on whether the dismissal of the pendent claims best serves the principles of judicial economy, convenience, fairness, and comity. See Queen City Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 444 (3d Cir. 1997); cf. Carnegie-Mellon University v. Cohill, 484 U.S. 343, 357 (1988) (suggesting comity inquiry in analogous situation).

_____

preserve his objection. Id. at 511. Pastore mentioned a possible exception to the affidavit requirement in cases in which the non-moving party "constructively" made a Rule 56(f) motion in his papers opposing summary judgment. Id. Annulli made no mention of a discovery insufficiency in his papers; in fact, he claimed that "clear evidence" established the existence of criminal acts of mail and wire fraud. This clear evidence of course proved illusory, see supra note 10, and Annulli's eagerness to rest on it effectively waived any Rule 56(f) claim.

20

Annulli argues that two years of litigation, fifteen pages of court docket, 1,800 pages of deposition testimony, and 2,800 pages of discovery documents militate in favor of retaining jurisdiction over his case, especially as he was on the eve of trial when the Defendants filed their motion for summary judgment. Although district courts have chosen to retain pendent jurisdiction in similar situations,12 courts of appeals have acknowledged the authority of district courts to refuse to do so.13

Here, we do the same. Although Annulli has spent a great deal of time engaged in discovery, as the Defendants point out, Annulli can use this evidence to pursue his state law claims currently pending in state court. Therefore, the judicial economy and convenience factors do not suggest that the Court's decision was an abuse of discretion. As for the fairness factor, Pitchell, supra note 13, is instructive:

_____

12. See, e.g., Doddy v. Oxy USA, Inc., 101 F.3d 448, 455-56 (5th Cir. 1996) (holding that district court did not abuse its discretion in declining to remand pendent claims, where lawsuit had been in litigation for more than two years, trial date was less than one month away, parties had filed more than 300 pleadings, most parties had prepared extensive discovery disclosures, summary judgment motions were pending, and remaining causes of action did not raise any novel or unsettled issues of state law); Timm v. Mead Corp., 32 F.3d 273, 276-77 (7th Cir. 1994) (accord, on similar facts).

13. In Kennedy v. Schoenberg, Fisher & Newman, Ltd., 140 F.3d 716, 728 (7th Cir. 1998), for example, the court of appeals held that it would not "second-guess" the district court's discretionary decision to decline to exercise supplemental jurisdiction over plaintiff's state law claims after plaintiff's federal claims were dismissed, even though the district judge was familiar with both the facts and law of the case and the parties had undertaken discovery. The court described the district court's decision as " `almost unreviewable,' especially when all federal claims have been dropped from the case before trial and only state law claims remain." Id. (citation omitted). Similarly, in Pitchell v. Callan, 13 F.3d 545, 549 (2d Cir. 1994), the court of appeals upheld the district court's decision, made shortly before trial, to dismiss plaintiff's pendent claims after it had disposed of plaintiff's federal claims. The court explained this result, writing that it was "not persuaded by [plaintiff's] argument that he is being prejudiced by the delay resulting from the necessary pursuit of his state-law claims in state court. . . . When [plaintiff] brought his state-law claims in federal court, he must have realized that the jurisdiction he invoked was pendent and possibly tentative." Id. (citation omitted).

Annulli and his lawyers knowingly risked dismissal of his
pendent claims when they filed suit in federal district court
and invoked the Court's discretionary supplemental
jurisdiction power. Lastly, comity favors allowing the state
court to hear Annulli's state law claims. On review of these
factors, we find no abuse of discretion and accordingly
affirm the Court's decision not to exercise supplemental
jurisdiction under S 1367(c).14

The judgment of the District Court will be affirmed.

A True Copy:
Teste:

Clerk of the United States Court of Appeals
for the Third Circuit
_____

14. In an attempt to avoid this result, Annulli cites our decision in
Growth Horizons, Inc. v. Delaware County, 983 F.2d 1277 (3d Cir. 1993).
Annulli's reliance on that case is misplaced. In Growth Horizons, the
district court had already held a trial on the merits and heard all of the
evidence necessary to reach a decision on plaintiff's state law claim. See
id. at 1285. Before rendering judgment on this claim, the district court
mistakenly dismissed it along with the underlying federal claim for want
of subject matter jurisdiction. See id. at 1284. We reversed this
decision,
held that plaintiff's federal law claims were without merit, and
instructed
the district court to exercise its discretion under 28 U.S.C. S 1367(c) to
determine whether judicial economy, convenience, and fairness to the
parties dictated that the district court decide plaintiff's surviving
pendent
claims. See id. In passing, we suggested that " `if the dismissal of the
main claim occurs late in the action, . . . knocking[the dependant
claims] down with a belated rejection of supplemental jurisdiction may
not be fair.' " Id. at 1285 (citation omitted). We did not say that on the
facts presented, however, the district court must hear the pendent
claims given these fairness concerns. In Annulli's case, a trial has not
been had, and the District Court cannot render judgment on Annulli's
state law claims without further litigation. Moreover, the Court has
already exercised its judgment and decided that a trial on the state
claims is not warranted.

22